[Civ. No. 53972. Second Dist., Div. Five. Feb. 11, 1980.]

*ANTHONY FERRARO et al., Plaintiffs and Appellants, v. SOUTHERN CALIFORNIA GAS COMPANY, Defendant and Appellant.

*Reporter's Note: This case was previously entitled "Ferraro v. William Lyles Construction Company."

**COUNSEL**

Lawrence J. Moreno and Stephen R. Cosel for Plaintiffs and Appellants.

Cohen, England, Whitfield & Osborne, Thomas B. Osborne, Lawler, Felix & Hall, Erwin E. Adler and Anthony R. Delling for Defendant and Appellant.

OPINION

STEPHENS, J.—This is an appeal arising out of a suit for property damages. A judgment of zero dollars in damages was entered on behalf of appellants following a jury verdict of $91,081.12 in their favor due to deductions for a prior settlement at the end of the liability phase of the trial with the major tortfeasors, and for a previous insurance settlement and subrogation agreement between appellants and their insurance carrier. Appellants contend that the damages awarded were inadequate as a matter of law, that the court erred in refusing to give a "collateral source" jury instruction and that the court abused its discretion by failing to set aside a stipulation between the parties which allowed $65,500 to be deducted from the verdict as representing fire insurance proceeds. Respondent Southern California Gas Company (hereinafter Gas Company), the only defendant remaining at the damage phase of the trial—William Lyles Construction Company (hereinafter Lyles) and Southern California Edison Company (hereinafter Edison) having settled with plaintiffs at the end of the liability phase—cross-appeals on the failure of the trial court to award it costs and the awarding of costs, instead, to appellants.

The property damage claim filed by appellants in early February 1976 arose out of an explosion and fire which destroyed three structures in Oxnard beach on September 4, 1974. Appellants had purchased the property about one year before the explosion for $64,225 for the land, a two-bedroom and den house built in the 1920's or 1930's and a store built in the early 1940's which had an attached storeroom with a bachelor apartment overhead. Existing leases entitled appellants to receive a total of $560 per month in rent for the three units. Appellants' beachfront property is situated where Oxnard beaches "Hollywood-By-The-Sea" and "Hollywood Beach" meet. A zoning ordinance was passed some time prior to appellants' acquisition of the property which had the effect of making the structures on the land a nonconforming use and which prevented appellants from rebuilding all three structures on the same location.

On September 4, 1974, a backhoe operator was working under Lyles supervision, who had contracted to lay a new electrical line for Edison near the appellants' property. The backhoe operator accidently pulled loose a gas service connection which resulted in gas percolating into the ground. It eventually entered the store and ignited. The resulting explosion destroyed the structures.

After the explosion, appellants settled their claims with their fire insurance carrier, Safeco Insurance Company. They received the upper limit for damage to structures and trade fixtures, $70,000 and $2,600 for damage to personal property. As part of their settlement with Safeco, appellants subrogated their right to recovery in such amounts as follows: "IN CONSIDERATION OF the payment of this sum, I/we hereby subrogate the company, to the amount of such payment, to all my/our rights of recovery for such loss or expense and I/we hereby further agree, upon demand, to execute all documents required of me/us and to cooperate with said company in prosecuting all actions to effect such recovery, and the company is hereby authorized to commence and prosecute any necessary action or proceedings in my name, or in its own, or in the name of any person or persons to whom it may assign its claim hereunder, for the purpose of effecting collection of the amount above mentioned."

Thereafter, on August 18, 1975, Safeco filed its complaint against Edison, Lyles and the Gas Company. On February 6, 1976, appellants also filed a complaint against Edison and Lyles and various other defendants. The Gas Company was added as a "Doe" defendant about six months later. Consistent with their subrogation agreement with Safeco, appellants alleged in their complaint that they had received insurance benefits in the amount of $70,000 from Safeco. They did not, however, attempt to join Safeco in the action, nor did Safeco seek to join. Defendants in two other actions based upon the same explosion (Davis Communications, Inc. and Oxnard Cablevision, Inc.) moved on May 16, 1977, to have their cases consolidated, which motion was granted. Trial began on September 14, 1977. At the conclusion of the liability phase, the jury determined that Edison and Lyles, its contractor, were 85 percent at fault and that the Gas Company was 15 percent at fault. At the beginning of the damage phase of the trial, appellants settled their claim with Edison and Lyles for $35,000. The damage phase was continued as to the remaining defendant, the Gas Company, with extensive testimony as to fair market value of the property and the various factors utilized to make that determination, which included such factors as comparable sales, rental income, reconstruction cost, the impact of the zoning restrictions, appreciation from market forces and what the highest and best use of the property would be.

After approximately three and one-half weeks of testimony in the damages phase of the trial, counsel for the Gas Company began his closing argument to the jury. After reviewing the claims of damages, he

noted that the evidence had shown that "$70,000.00 has already been received" by appellants. He therefore contended that there was a problem with "double recovery." Counsel for appellants objected and there was an in-chambers conference during which the trial judge noted that appellants had raised the issue at the outset of the litigation by putting the fact of their insurance recovery in their complaint. However, it became clear that what appellant's counsel was particularly concerned about was that respondent should not be allowed to make statements that tended to equate the receipt of insurance proceeds with the receipt of workers' compensation benefits. Therefore, it was agreed that the judge would caution the jury that the two were not the same. At this time appellant's counsel also asked the judge to give along with the cautionary statement a definition of collateral source. The court declined, saying that it would wait until such an instruction was actually offered. Once back in the courtroom, the court instructed the jury that, "[t]he objection was that the argument to the extent that it seeks to compare the legal principles which apply to workmen's compensation to a situation involving fire insurance is incorrect, and the Court sustains the objection." Then, without objection from appellants, the Gas Company argued to the jury that appellants, having received $70,000 worth of insurance proceeds, "are not entitled to get paid for the same thing twice."

The following court day, a three-day weekend intervening, appellants sought to preclude the Gas Company from further arguing about the receipt of insurance benefits and asked the court to include an instruction to the jury defining collateral source and instructing it that the jury should make no deduction for the recovered insurance proceeds.[1] When the trial court refused to give such an instruction, a stipulation was entered into by counsel for appellants and respondent wherein it was agreed that the court could deduct the sum of $65,500 from any damage verdict rendered in favor of appellants: "The jury shall fix the full amount of damages as to Morenos et. al. without any deduction for the $70,000 fire insurance proceeds. The court shall then deduct the sum of $65,500 ($70,000 - $4,500) and the judgment shall be entered for the resulting amount. The $4,500 represents the costs to Morenos et al. in recovering the $70,000." The judge accepted the stipulation. When ar-

---

[1]The requested instruction read as follows: "If you find from the evidence that the (plaintiffs) have received some compensation for their losses from a source wholly independent of the defendant SOUTHERN CALIFORNIA GAS COMPANY such payment should not be deducted from the damages you find that the plaintiffs are entitled to under these instructions."

gument resumed before the jury, counsel for the Gas Company retracted his previous argument to the jury regarding the problem of double payment, explaining, "...On Friday in discussing the damage suffered by the landowners, the Ferraros and Morenos, I asked you to reduce whatever damages you found by the $70,000 of insurance that was paid to them. You are no longer to do that. [¶] You are to find what you determine to be the damages suffered by the Morenos and the Ferraros, and with respect to that insurance coverage or insurance payment the court at the appropriate time in an appropriate manner takes that into consideration."[2] After lengthy deliberations, the jury returned with a verdict in appellants' favor of $91,081.12, but the ultimate judgment entered on December 19, 1977, was zero due to the previously mentioned deductions for insurance proceeds and settlement.

On January 30, 1977, the court heard appellants' motion for a new trial and motion to tax costs, as well as respondent's motion to tax costs. On February 2, 1977, the trial court denied appellants' motion for a new trial and respondent's motion to tax costs, but granted appellants' motion to tax costs. This appeal and cross-appeal followed.

Prior to filing a respondent's brief, respondent filed a motion to dismiss the appeal in which it argued that appellants had split their cause of action and that, therefore, their appeal should be dismissed. On July 18, 1979, we filed an order deferring any ruling on the motion to dismiss based on judicial economy. As appellants noted in their opposition to the motion, an appellate court "will ordinarily deny a motion to dismiss if it requires an examination of the record or a consideration of the merits of the appeal." (6 Witkin, Cal. Procedure (2d ed. 1971) Appeal, § 457, p. 4414, citing *Chino Land etc. Co.* v. *Hamaker* (1916) 171 Cal. 689, 690 [154 P. 850].) Since consideration of whether appellants have split their cause of action requires delving into the record and the merits of the appeal, we deferred ruling on the motion and will instead consider the motion to dismiss together with the merits of the appeal, beginning our discussion with respondent's contention regarding appellants' splitting of their cause of action.

---

[2]The statement quoted from the Gas Company's counsel is contained on a page of the reporter's transcript which was the subject of a motion to augment the record on appeal which we granted. The text on the page as contained in the original record designated on appeal ended just before the quoted material with an indication that the remaining portion of counsel's remarks were deleted. Obviously, an error or oversight was responsible for the record appearing in this manner, and augmentation was clearly in order.

## I. Does an Insured Split a Cause of Action by Filing a Complaint Against a Tortfeasor When the Insured Has Received Insurance Benefits and Subrogated the Insurer to the Amount of Such Proceeds?

■ It has become axiomatic that a single cause of action cannot be split and made the basis for several suits. The rule against splitting a cause of action is both a rule of abatement of actions—a defendant in a second suit may plead the pendency of the first in abatement—and a rule involving the application of the doctrine of res judicata—a defendant in a second suit, if a previous suit has been concluded and judgment rendered on the merits, may plead that judgment as a bar. (See 3 Witkin, Cal. Procedure (2d ed. 1971) Pleading, § 32, p. 1715.) In *Wulfjen* v. *Dolton* (1944) 24 Cal.2d 891, 894-895 [151 P.2d 846], the court set out the policy behind such a rule: "The rule against splitting a cause of action is based upon two reasons: (1) That the defendant should be protected against vexatious litigation; and (2) that it is against public policy to permit litigation to consume the time of the courts by relitigating matters already judicially determined, or by asserting claims which properly should have been settled in some prior action."

■ Respondent's claim that appellants have split their cause of action in this case stems from the fact that upon receipt of the fire insurance proceeds, appellants executed a subrogation agreement in which their insurance carrier, Safeco, was subrogated in the amount of such proceeds. Such subrogation, which is "a legal device which transfers a portion of the injured person's claim for damages against the wrongdoer to the agency which carried that portion of the costs of personal injuries" (*Ventura County Employees' Retirement Association* v. *Pope* (1978) 87 Cal.App.3d 938, 950 [151 Cal.Rptr. 695]), results in two or more parties having a right of action for recovery of damages based upon the same underlying cause of action.[3] It is this resultant bifurcation in the parties, each having a right of action against it, that the Gas Company claims impermissibly splits appellants' cause of action.

---

[3]For an interesting discussion of the problems arising from deficiencies in our legal vocabulary making it difficult to "differentiate sufficiently between the operative facts that form the basis for a legal claim (Code Civ. Proc., §§ 307, 425.10) and the right of the person entitled to pursue that claim (Code Civ. Proc., §§ 367, 378)," see *Ventura County Employees' Retirement Association* v. *Pope, supra*, at page 953. We have adopted that court's approach by using the terms "cause of action" and "right of action" to so differentiate.

It has been held that the rule against splitting a cause of action does encompass situations involving partial subrogation. Thus, in *Steigerwald* v. *Godwin* (1956) 144 Cal.App.2d 591, 596 [301 P.2d 386], the court said, in speaking of a counterclaim against the plaintiff, that "[t]he subrogation receipt by its terms conveyed away any and all rights of defendant against plaintiff. But if it were interpreted to convey only the rights covered by the insurance, defendant is met with the rule against splitting a cause of action. Defendant, as the insured, and his assignees, as subrogated insurers, are 'privies' and the same parties under section 1910 of the Code of Civil Procedure. [Citations.]"

In a later case, *Phillips* v. *Western Pac. R.R. Co.* (1971) 22 Cal. App.3d 441, 444-445 [99 Cal.Rptr. 451], the court initially seems to hold that the rule against splitting a cause of action does not apply to a partial subrogee, for which proposition appellants rely on the case. However, later language in the case as applied to the facts points to the opposite proposition. The court says: "Western Pacific in this appeal contends the cross-complaint was a splitting of the cause originally brought by Cal-Farm. Western bases its argument primarily on the case of *Steigerwald* v. *Godwin* (1956) 144 Cal.App.2d 591, 595-596, . . . wherein it was held that where there is a complete subrogation of all rights to the insurer, this bars action by counterclaim of the insured primarily because of the assigning away of all rights but also (as dictum) because of the rule against splitting. The case is distinguishable on its facts from the instant case. The rule against splitting is acknowledged by court decisions to be harsh as applied in some cases and consequently as to some situations approaches to the rule have been developed wherein causes of action should be viewed with flexibility to avoid a harsh result not intended by the basic principles of the rule as enunciated in the *Wulfjen* case, *supra*. One of these situations is in regard to actions by a *partial* assignee or subrogee. Here, we have a partial subrogee in the original plaintiff, Cal-Farm. Such subrogee may sue, as he did here, the negligent party who caused the monetary damage partially paid by the subrogee. [Citations.]" (Italics in original.) However, the court then went on to note that "[b]y joining the insured who was the injured party the plaintiff has not subjected Western Pacific to a split or multiple action but has rather allowed the determination of the entire liability in a single lawsuit. The joinder of Phillips as a defendant and the subsequent cross-complaint of Phillips against Western Pacific as the negligent party has actually *prevented* any attempt at splitting of a claim (by a later action possibly brought by Phillips), not caused a splitting." (*Id.* at p. 445; italics in original.)

The foregoing seems to indicate the court's recognition that while a partial subrogee may bring an action against the negligent party who caused the loss sustained by it, and hence likewise the partial subrogor who has had only part of his loss redeemed by the subrogee, in order that neither suit constitute a splitting of a cause of action, the parties should join in a single suit against the tortfeasor. Consistent with this observation is the court's language that "[i]n fact a possible compulsory joinder requirement confronted the original plaintiff Cal-Farm because Western Pacific was liable on a single claim of Phillips and the partial subrogee should join his subrogor in the same suit, as Western Pacific was entitled to have its liability satisfied in a single action." (*Id.*) Therefore, despite the language in *Phillips*, which seems initially to indicate that an action by a partial subrogee against the tortfeasor does not constitute a splitting of a cause of action, later language relating to specific facts of that case shows that that court would have considered a suit brought only by the subrogee or subrogor to constitute a splitting of a cause of action. It was only because the subrogor, Phillips, and the partial subrogee, Cal-Farm, were joined in the same action, in which Phillips filed a cross-complaint, that a splitting of causes of action was prevented.

In this case it is clear that the subrogation clause resulted in a partial subrogation to Safeco, that is, subrogation in the amount of the insurance proceeds only. Therefore, appellants could still maintain a cause of action against the tortfeasors for those losses beyond such insurance proceeds. Nonetheless, failure of appellants to join Safeco or of Safeco to intervene did result in a splitting of the cause of action and did result in multiple litigation as decried in *Wulfjen.* However, even though a splitting of a single cause of action did occur by the maintenance of two suits, one by appellants and one by Safeco against the Gas Company, we agree with appellants that the Gas Company's failure to raise the issue before the trial court has resulted in a. waiver of the objection respondent Gas Company now seeks to raise.

The defense that a plaintiff has split a cause of action is an affirmative defense, which must be pleaded by a defendant in abatement. "'Prohibition against splitting a cause of action is for the benefit of the defendant and he may waive or renounce it by agreement.'" (*Williams v. Krumsiek* (1952) 109 Cal.App.2d 456, 460 [241 P.2d 40], quoting from *Commercial Standard Ins. Co.* v. *Winfield* (1938) 24 Cal.App.2d 477, 478 [75 P.2d 525].) Further, "[s]plitting of actions is not jurisdictional and may be waived; if the defendant does not object, the

judgment is binding upon him." (*Id.*) Therefore, the failure of the Gas Company to object to the splitting of the cause of action against it by the maintenance of separate law suits by appellants and Safeco Insurance results in their having waived the defense. Certainly, the policy considerations recognized in *Wulfjen* would hardly be promoted by allowing a defendant to defend two lawsuits almost simultaneously, based upon the same event or occurrence, and then when the final judgment is appealed by one of the plaintiffs, to assert that the appeal should be dismissed because the cause of action had been split. Such a defendant must be prepared to take either the possibility of an adverse judgment in one or both the suits or, if in the event a judgment is rendered in his favor, the possibility that the plaintiff will appeal, without raising at such a late date the fact that a splitting of a cause of action has occurred. Therefore, respondent's motion to dismiss the appeal on the basis that appellants have split their cause of action is denied.

■ Similarly, respondent also contends that having failed to join Safeco, an indispensable party in the action, appellants are barred from any recovery. However, the answer to this contention is found in *Kraus* v. *Willow Park Public Golf Course* (1977) 73 Cal.App.3d 354, 363-369 [140 Cal.Rptr. 744]. In that case, the court undertook an extensive analysis of the effect of the failure to join an indispensable party to an action. Conceding in this case that a partial subrogee, like a partial assignee, is an indispensable party (see, e.g., *Bank of Orient* v. *Superior Court* (1977) 67 Cal.App.3d 588, 595 [136 Cal.Rptr. 741]), *Kraus* thoroughly explains nonetheless that "[a]lthough many cases have so stated, the failure to join an 'indispensable' party is not 'a jurisdictional defect' in the fundamental sense; even in the absence of an 'indispensable' party, the court still has the power to render a decision as to the parties before it which will stand. [Citations.] It is for reasons of equity and convenience, and not because it is without the power to proceed, that the court should not proceed with a case where it determines that an 'indispensable party' is absent and cannot be joined." (*Id.* at p. 364. Fn. omitted.) The court in *Kraus* bolstered its reasoning by noting that section 389 of the Code of Civil Procedure, dealing with joinder, was amended in 1971 to conform to rule 19 of the Federal Rules of Civil Procedure. The court noted that "[s]ince the 1971 amendment to section 389, the California Supreme Court has not ruled on the matter, but, in dicta, the Courts of Appeal have continued to state that the absence of an indispensable party deprives the court of jurisdiction over the subject matter [citations]. This is not, however, the correct rule under former section 389 of the Code of Civil Procedure, and it is clearly

not the rule under rule 19, Federal Rules of Civil Procedure, and section 389, as amended in 1971." (*Id.* at p. 365. Fn. omitted.)

In *Kraus*, as here, the objection for failure to join was raised for the first time on appeal. The court in *Kraus* noted, and we agree, that "'[w]here a case has been fully tried without objection to the absence of parties and the claim that the absent parties were indispensable is raised for the first time on appeal, the rule's underlying policy considerations of avoiding piecemeal litigation and multiplicity of suits [citations] are of little consequence inasmuch as the judicial and litigant resources necessary to the litigation have already been expended.'" (*Kraus v. Willow Park Public Golf Course, supra*, 73 Cal.App.3d at p. 369, quoting from *King v. King* (1971) 22 Cal.App.3d 319, 326 [99 Cal.Rptr. 200].) Therefore, the Gas Company may not raise the failure of appellants to join Safeco for the first time on appeal.

## II. DID THE PROCEEDS FROM THE SAFECO INSURANCE POLICY CONSTITUTE RECOVERY FROM A COLLATERAL SOURCE?

Appellants contend that the $70,000 they received on their Safeco fire insurance policy is a collateral source, that the trial judge erroneously failed to instruct the jury that it was such and that appellants were, therefore, forced to enter into the stipulation with respondent regarding the deduction of $65,500 from whatever recovery appellants might be awarded by the jury, which the trial judge later erroneously denied relief from. In order to answer these contentions, we must first determine whether or not the proceeds were, in fact, a collateral source recovery. "The collateral source rule expresses a policy judgment in favor of encouraging citizens to purchase and maintain insurance for personal injuries and for other eventualities. Courts consider insurance a form of investment, the benefits of which become payable without respect to any other possible source of funds. If we were to permit a tortfeasor to mitigate damages with payments from plaintiff's insurance, plaintiff would be in a position inferior to that of having bought no insurance, because his payment of premiums would have earned no benefit. Defendant should not be able to avoid payment of full compensation for the injury inflicted merely because the victim has had the foresight to provide himself with insurance." (*Helfend v. Southern Cal. Rapid Transit Dist.* (1970) 2 Cal.3d 1, 10 [84 Cal.Rptr. 173, 465 P.2d 61, 77 A.L.R.3d 398].)

The foregoing quotation has become the classic statement regarding California's collateral source policy, and is relied upon by appellants in this case. The importance of the rule in California is demonstrated by cases such as *Hrnjak v. Graymar, Inc.* (1971) 4 Cal.3d 725 [94 Cal.Rptr. 623, 484 P.2d 599, 47 A.L.R.3d 224], in which the Supreme Court held that "[t]he potentially prejudicial impact of evidence that a personal injury plaintiff received collateral insurance payments varies little from case to case. Even with cautionary instructions, there is substantial danger that the jurors will take the evidence into account in assessing the damages to be awarded to an injured plaintiff. Thus, introduction of the evidence on a limited admissibility theory creates the danger of circumventing the salutary policies underlying the collateral source rule. Admission despite such ominous potential should be permitted only upon a persuasive showing that the evidence sought to be introduced is of substantial probative value. [Citation.]" (*Id.* at pp. 732-733. Fn. omitted.) Therefore, the court reversed the judgment and remanded the case to the trial court for a new trial on the issue of damages, solely on the basis that the trial court had erroneously allowed the introduction of evidence showing that the plaintiff had received compensation from his automobile liability insurance and disability insurance policies, the prejudicial effect of that evidence not being effectively cured by the cautionary instructions. (4 Cal.3d at p. 734.)

Although the strong adherence of California courts to the collateral source rule cannot help but be recognized, in this case there is the competing interest, also well recognized by our courts, that a defendant may not be subjected to double liability. While the court in *Helfend* made clear that a plaintiff is not to be penalized for his own providence, it also emphasized that "[i]n reaffirming our adherence to the collateral source rule in this tort case involving a plaintiff with collateral payments from his insurance coverage, we do not suggest that the tortfeasor be required to pay doubly for his wrong—once to the injured party and again to reimburse the plaintiff's collateral source...." (*Helfend v. Southern Cal. Rapid Transit Dist., supra*, 2 Cal.3d 1, 11, fn. 15.)

As recently observed in *Ventura County Employees' Retirement Association v. Pope, supra*, 87 Cal.App.3d 938, 951, "[a]n adjunct of subrogation is the rule prohibiting double recovery of damages, a rule of special importance in the prosecution of subrogation claims because the proration of damages among those who have shared the costs of

personal injuries increases the possibility of duplicate claims for the same loss. Only one totality of recovery of damages for personal injuries is allowed, and only one totality of liability may be imposed on the tort-feasor. [Citations.]"

The underlying suit in *Ventura County* was brought by the sub-rogee-retirement association against the third party tortfeasor for damages sustained by it by virtue of disability benefits paid to the victim-member of the association. Although the instant suit is between the subrogor-victim and the tortfeasor, the same theories must apply. Despite the unusual posture—a suit by a subrogor against a tortfeasor in which the subrogee is not joined and has not sought intervention—the rule against double liability must still predominate. Accordingly, the payment of the $70,000 in insurance proceeds in this case, due to the subrogation agreement with Safeco, cannot be considered "collateral source" recovery. On the contrary, a collateral source is one "'wholly independent of the tortfeasor.'" (*People* ex rel. *Younger* v. *Superior Court* (1976) 16 Cal.3d 30, 36, fn. 3 [127 Cal.Rptr. 122, 544 P.2d 1322].) Therefore, since "[t]o subrogate is to put in the place of another; to substitute" (*Eckman* v. *Arnold Taxi Co.* (1944) 64 Cal. App.2d 229, 234 [148 P.2d 677]), when an insurance carrier becomes subrogated to the claim of an insured against a third party tortfeasor, the payment of insurance proceeds is no longer a "collateral source." To characterize appellant's receipt of the $70,000 as a collateral source payment would violate the rule against double recovery, since both the subrogee and the subrogor have a right of action against the tortfeasor. The tortfeasor would have potential double liability if payment of insurance benefits by the subrogee to the subrogor is allowed to be designated a "collateral source." Therefore, the trial judge properly denied appellant's request for a collateral source jury instruction.

Similarly, the trial court also correctly denied appellant's motion to be relieved from their stipulation with respondent regarding the deduction of $65,500 from any verdict in their favor. The effect of this stipulation is the prevention of double liability for the Gas Company in accordance with proper legal principles. As the court noted when appellants sought to be relieved from the stipulation when the jury verdict was lower than they had hoped, the stipulation was "freely negotiated between counsel," and appellants' counsel did not "make any mistake as to where he stood when he entered into the stipulation." It is clear that appellants' counsel sought for them what seemed at the time to be a

tactical advantage when he realized that the court was not going to buy his argument that the insurance proceeds were a collateral source. By virtue of the stipulation, respondent withdrew its argument to the jury that the entire $70,000 should be taken into consideration when they determined the amount of damages to be awarded appellants. Instead, only $65,500 was deducted by the trial judge, allowing appellants to receive credit for the $4,500 it cost them to obtain the insurance settlement. The only mistake we can see in this situation is that appellants' counsel did not foresee that the jury verdict might be of such an amount that following the deduction for the settlement with Edison and Lyles and for the insurance proceeds, a zero dollar balance would remain.

### III. Did the Court Err in its Instructions to the Jury Regarding Damages?

Appellants contend that the court erroneously denied instructions submitted by them on the issue of damages and gave instead instructions submitted by the Gas Company. The resultant award of damages, they argue, is inadequate as a matter of law. Although their contentions in this regard are somewhat rambling, we have divided them into three subdivisions which allow for an organized discussion.

### 1. What is the proper date of evaluation of the destroyed property—time of destruction or time of trial?

A large portion of appellant's opening and reply briefs is dedicated to their argument that, as in inverse condemnation proceedings, the time of trial should be the time of evaluation, not the time of destruction. Despite the length of their arguments, we find them unpersuasive.

Appellants' claim that the *present* fair market value of the original buildings, had they not been destroyed, is the proper measure of their damages for the buildings' destruction, is predicated on section 1263.130, Code of Civil Procedure. This section, which deals with situations of inverse condemnation, provides: "Subject to Section 1263.110, if the issue of compensation is not brought to trial within one year after commencement of the proceeding, the date of valuation is the date of the commencement of the trial unless the delay is caused by the defendant, in which case the date of valuation is the date of commencement

of the proceeding." As explained by our Supreme Court, "[t]he section is plainly an expedition statute: it puts a premium on the condemner to get the case to trial within the year, and it puts a burden on the defendant who for any reason delays the setting of the trial beyond the one-year period." (*People* v. *Murata* (1960) 55 Cal.2d 1, 6. [9 Cal.Rptr. 601, 357 P.2d 833].) Respondent asserts, and we think correctly, that the basic dynamics of a suit for inverse condemnation are fundamentally different than those in a property damage case. Since, in a property damage case it is the duty of a plaintiff to use diligence to bring the case to trial (*Breckenridge* v. *Mason* (1967) 256 Cal.App.2d 121, 126 [64 Cal.Rptr. 201]), a rule that invites a plaintiff to use dilatory tactics in order to take advantage of a rising market would encourage a type of pretrial gamemanship inconsistent with our judicial system. Section 1263.130 acts in an inverse condemnation case to promote speedy adjudication of the action; in a property damage case, it could result in just the opposite, as well as allow currently fluctuating market forces to dominate settlement efforts. The Legislature clearly had no such application of the statute in mind and we are disinclined to wreak havoc on the civil trial system by following appellants' urgings in this regard. It is clear that diminution in value is "the difference in the value of real property *immediately before and after the injury*." (*Mozzetti* v. *City of Brisbane* (1977) 67 Cal.App.3d 565, 576 [136 Cal.Rptr. 751]. Italics added.)

2. Did diminution in value of the property as a measure of damages provide appellants with just compensation for their loss?

"The primary object of an award of damages in a civil action, and the fundamental principle on which it is based, are just compensation or indemnity for the loss or injury sustained by the complainant, and no more [citations]. While there is no fixed, inflexible rule for determining the measure of damages for injury to, or destruction of, property, and whatever formula is most appropriate in the particular case will be adopted. . .in a case involving damage to plaintiff's property due to defendant's negligence, the general rule is that if the cost of repairing the injury and restoring the premises to their original condition amounts to less than the diminution in value of the property, such cost is the proper measure of damages; and if the cost of restoration will exceed such diminution in value, then the diminution in value of the property is the proper measure [citations]." (*Mozzetti* v. *City of Brisbane, supra*, 67 Cal.App.3d 565, 576. Italics in original omitted.)

■ It is clear from the foregoing that *either* diminution in value *or* cost of restoration, whichever is less, is the proper measure of damages in a property damage case. Appellants argue that because the cost of reconstruction was set by the jury as $90,087.51, an award to them of damages for diminution in value of $57,000 does not amount to just compensation for the loss suffered. However, they cite no authority in support for their argument that they should have been awarded the higher figure. On the contrary, such an award would fly in the face of all precedent in this state.

The jury in this case was instructed by the judge that "The measure of damages for the total destruction of buildings or other structures located on real property is the difference between the fair market value of the property immediately before the destruction and the fair market value of the property immediately after the destruction." This is an entirely correct statement of the law. Accordingly, the jury found that the property of appellants was diminished in value due to the destruction of the buildings in the amount of $57,000, the highest evaluation of the structures as given in testimony by respondent's own expert. Diminution of value as the measure of damages allowed the jury to consider all those unique features of appellants' property that they seek as separate items of damage. As respondent astutely points out: "The forces of the market place affixed a value to this nonconforming use when appellants purchased the property. Those same market forces permitted the experts to determine market value on the date of the explosion which, in turn, assisted the jury in making its finding."

3. Were appellants improperly denied award of lost rental income?

Appellants contend that it was improper for the jury to be allowed to award them only diminution in value of their property without consideration of their loss of rental income. As support for this argument, appellants cite *Linforth* v. *S.F. Gas and Electric Co.* (1909) 156 Cal. 58 [103 P. 320]. However, rather than supporting appellant's point, this case serves to show how and why appellants are mistaken in their contention.

As previously stated, the correct measure of damages in this case was the amount by which appellants' property was diminished in value due to respondent's negligence. The fact situation in *Linforth*, however, was different. There the court was faced with a situation where a gas explo-

sion had not totally destroyed a building, but merely damaged it. Therefore, the court concluded that the "rule allowing compensation for the cost of restoration to the original condition when this can be done at a reasonable expense, together with compensation for the loss of the use of the property is in precise accord with section 3333 of the Civil Code." (*Linforth* v. *S.F. Gas and Electric Co., supra,* 156 Cal. 58, 62-63.) There is no question that when cost of restoration is the correct measure of damages for injury to real property, compensation for loss of use, in this case lost rents, would be appropriate. This case does not answer, nor even address, whether loss of use is an appropriate adjunct to damages that are predicated upon a diminution in value theory.

In his Handbook of the Law of Damages, Professor McCormick notes: ". . . if the improvement is merely damaged and not destroyed, damages are usually measured by the reasonable cost of repair or restoration to the condition before the injury [fn. omitted], together with compensation for the loss of the use of the property during the period of repair." (McCormick, Damages (1935) pp. 483-484.) As a footnote at the end of this quotation, he further points out, "[b]ut if the building is not merely damaged, but destroyed, no allowance for loss of use can be made." (*Id.*, at p. 484, fn. 11.) Therefore, appellants are incorrect in their contention that they were entitled to both diminution of value and loss of use.

An additional theory of appellants in their argument regarding the inadequacy of the damages is that they were not compensated for the loss resulting from the fact that they could not rebuild several of the destroyed buildings because of the zoning ordinance. However, what appellants fail to realize is that by seeking the cost of rebuilding these buildings, as well as the cost of acquisition of additional land upon which to construct them, they are asking to be compensated twice for their loss. By awarding them the diminution in value of their property immediately before and after the destruction of the buildings, the legally recognized loss suffered by appellant was fully compensated for. They are not entitled to receive both diminution in value and cost of reconstruction.[4]

---

[4]Respondent makes what at first seems to be a rather convincing argument based upon the following quotation: "[R]espondents are not entitled to recovery for any damages resulting from an ordinance of general application. It is an elementary proposition of law that damages stemming from a legitimate exercise of the police power are non-compensable provided the proper limits of that power had not been exceeded.

■ On the issue of costs raised by respondent's cross-appeal, we disagree with respondent that the court improperly awarded costs to appellants. Respondent bases its argument on the fact that appellants, while they did receive a verdict in their favor, did not receive a favorable net judgment. Section 1032 of the Code of Civil Procedure states, in pertinent part: "In the superior court, except as otherwise expressly provided, costs are allowed of course: [¶] (a) To a plaintiff upon a judgment in his favor;... in an action for the recovery of money or damages;..." Respondent claims that appellants did not receive "a judgment in [their] favor" within the meaning of that section, and that subdivision (b) of section 1032 entitles it to costs as a defendant who has received "a judgment in his favor." Respondents rely on *Gerstein* v. *Smirl* (1945) 70 Cal.App.2d 238 [160 P.2d 585] as an oft-cited case for the proposition that a plaintiff must recover a net judgment in his favor or a defendant is entitled to costs. However, we think that *Gerstein* cannot be cited for quite so broad a proposition without looking to the underlying facts of that case. Unlike the instant case, *Gerstein* was a situation where neither liability nor damages were assessed against the defendant. The court said (at pp. 240-241): "As we read section 1032, it is intended thereby that, if plaintiff in an action fails to make out his case, the defendant is entitled to judgment and must be regarded as the prevailing party.... In an action such as the instant one for damages, the 'net result' of a judgment requiring defendant to pay nothing to the plaintiff is favorable to the former."

Respondent emphasized the second sentence in its brief. However, the first sentence is crucial to the overall meaning of the case. Here appellants did not "fail to make out their case," as in *Gerstein*. To consider appellants as not having received a "favorable judgment" would exalt form over substance. They certainly were the prevailing party in the lawsuit and the fact that the Gas Company did not have to actually pay them any damages was due not to any deficiency in their case, but due to circumstances not directly stemming from the issues regarding liability as litigated between the parties. Disallowance of an award of costs

[Citations.]" (*Mozzetti* v. *City of Brisbane, supra,* 67 Cal.App.3d 565, 577.) However, what respondent fails to recognize is that the authorities upon which *Mozzetti* relies for the foregoing statement are all cases involving either eminent domain or inverse condemnation—cases in which the plaintiffs were seeking damages stemming directly from action taken by a local or state government. Therefore, *Mozzetti* is inapplicable to the instant case. The question herein is not whether appellants would be entitled to damages from the City of Oxnard for the loss suffered by them due to the enactment of the zoning ordinance.

to appellants under these circumstances could only be based upon a hypertechnical construction of the words of section 1032, Code of Civil Procedure, unsupported by case law.

The judgment is affirmed in all respects.

Kaus, P. J., and Hastings, J., concurred.

The petition of plaintiffs and appellants for a hearing by the Supreme Court was denied April 17, 1980.