Filed 5/27/14  Key v. City of San Mateo Police Dept. CA1/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| PREMA SCOTT KEY,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>CITY OF SAN MATEO POLICE<br>DEPARTMENT et al.,<br><br>        Defendants;<br><br>ROBERT LANYON,<br><br>        Intervener and Appellant. | A135993<br><br>(San Mateo County<br>  Super. Ct. No. CIV 509507) |

Intervenor and appellant Robert Lanyon appeals from a judgment entered on July 5, 2012, which determined that plaintiff and respondent Prema Scott Key, as personal representative of the Estate of William L. Heinicke, deceased, was entitled to possession of a car that had been impounded by the City of San Mateo Police Department.  Appellant challenges the judgment on various grounds, none of which requires reversal.  Accordingly, we affirm.

**FACTS**

**A.        Background**

On February 9, 1970, appellant, claiming to be the registered owner of a "1968" white Ford Mustang with license plate number XAR927, filed a report with the police that the car had been stolen from the carport of his then home in Sausalito.  After the theft, appellant purportedly contacted Shelby America to confirm the value of the stolen

1

car and at some unspecified time his insurer paid him between $3,500 and $5,000 for the loss of the car.

On June 12, 1970, respondent's now deceased father, William L. Heinicke (Heinicke), paid $3,800 for a "1965" white Ford Mustang with license plate number 791ARD. For the next 40 years, Heinicke possessed and registered the car until his death on September 2, 2010, at which time the car became part of his estate currently being administered by respondent.

On July 17, 2011, City of San Mateo Police Sergeant Tim Sullivan observed Heinicke's now vintage Ford Mustang being driven on Third Avenue. Because Sullivan is a Mustang enthusiast, he ran a registration check that revealed the current registration was to a 1965 Mustang. Sullivan believed, however, that the car was a 1968 model, not a 1965 model. After stopping the car, Sullivan noticed it had two different license plates, the attached rear California vehicle license plate displayed "791ARD," while the front plate was reversed displaying "ARD791." Sullivan also observed that the public vehicle identification number (VIN) on the dash area of the car was missing and not present in the factory location. A secondary VIN in the engine compartment had also been removed and the area showed signs of tampering. However, secured to the left driver's door was a plate, displaying "65A" in the upper left hand corner and a VIN number that Sullivan "confirmed this number as the listed VIN to the attached rear plate 791ARD." According to Sullivan, the "65A" on the plate denoted a car manufactured in 1965, but, that number did not match the production year of the car.

In response to Sullivan's inquiries, Albert Heinicke, the driver of the Mustang, produced paperwork showing that the car had belonged to his uncle Heinicke. Albert Heinicke stated his uncle had owned the car for 40 years and the car was being inherited by respondent. Because Sullivan remained suspicious of the car's true origin, it was impounded pending an inspection by agents of the San Mateo County (SMC) Vehicle Theft Task Force.

On July 18, 2011, the impounded car was physically inspected by Special Agent Shawn Parks of the (SMC) Vehicle Theft Task Force and Agent Dave Roccaforte of the

2

National Insurance Crime Bureau. After a preliminary visual inspection, it was "clear" to the officers that the car was not a 1965 model, but a 1968 model, based on several design differences between the two models. After a more complete physical inspection of the car, and "through techniques generally known only to trained auto theft investigators," the officers determined, "with absolute certainty," that the "original and true" VIN was "8T02S126749-00103." Based on his training and experience, Parks recognized the situation as a "classic VIN switch case. Thieves often use VIN switching to disguise the identity of a stolen vehicle. They will replace the VIN on a stolen vehicle with a VIN that is not recorded as stolen. The thief will then drive or resell the stolen vehicle to an unsuspecting customer for a monetary gain."

Parks reported that a check of the "original and true" VIN in the California Law Enforcement Telecommunications System (CLETS) showed "no record on file," and a similar records check of all 50 states showed no registration or ownership information for that VIN. Parks asserted that the lack of information "is common, and sometimes expected, when dealing with older vehicles," because the Department of Motor Vehicles "purges data and records of vehicles that have not been registered for an extended period of time." Consequently, "[i]t is common in investigations of this nature to rely on databases maintained by the auto insurance companies, as they often maintain records dating back over 50 years."

Parks further reported that Roccaforte, a special agent employed by the insurance companies, had located information about the car from Vincent Liska, a caretaker for the Shelby Registrar, which maintains records of all Shelby Mustangs brought and sold since 1965. Liska provided information that a 1968 Mustang with "VIN 8T02S126749," was shipped from Ford to Shelby America on December 4, 1967, the car had a California license plate number XAR977, and the original owner's name was listed as Robert Lanyon. Parks and Roccaforte also queried a number of other databases in an effort to determine if the impounded car was indeed a " 'Shelby.' " Using the information from the Shelby America Registrar, the National Insurance Crime Bureau (NICB) database revealed the impounded car was "in fact" a 1968 GT 500 VIN 8T02S126749-00103 and

3

had been stolen from an individual named Robert Lanyon in the City of Sausalito in 1970.

Parks contacted Sausalito Police Department Detective Brian Mather, who provided microfiche that included the original theft report dated February 9, 1970. The report listed Robert Lanyon as the registered owner and original sales records also showed he had purchased the vehicle new. Parks spoke with appellant who then resided in Canada. Appellant described the recovered car to the best of his knowledge, and stated that he had purchased the car new and reported the theft to the police. He also reported that the original paperwork and theft report in his possession had been lost in a fire at his personal residence in Novato in 1976. Appellant could not recall his insurance carrier at the time of the theft, but he recalled contacting Shelby America to confirm a value for the stolen car and being paid for the loss by his insurer. In an "Fore Alert Law Enforcement" notice sent to NICB insurance company members, the SMC Vehicle Theft Task Force asked the companies to determine if they had insured the car at the time of the theft in 1970, noting that "[t]he original value of the vehicle, which was the payout the victim received, was between $3,500 and $5,000." As of July 18, 2011, the date of the police investigation report, no insurance company had reported that it had made a payment to appellant for the loss of the car.

Parks also spoke with respondent and his attorney regarding the impounded car. Parks was given documents showing the car's registration in the name of William Heinicke, a " 'pink slip' " (ownership document) and a Verification of Vehicle form. The " 'pink slip' " showed a purchase date of June 1970, approximately four months after the theft. No recovery data was available in the NICB database to show the car had been recovered as stolen and resold. Parks also reviewed the Verification of Vehicle form and concluded "without question" that the California Highway Patrol officer who had completed the form had made an error in verifying the car, and therefore, according to Parks, the document did not reflect the true identity of the impounded car. Parks further commented that because Heinicke had died, his involvement in the purchase and

4

ownership of the car could not be ascertained and, given the passage of time, it was unlikely anyone would be prosecuted for the original theft.

Parks concluded his report by noting that "[w]hile the scope of the investigation to determine the true identity of the vehicle is within [his] expertise, the civil issue to determine legal ownership of the [impounded] vehicle is not." The officer also was not able to ascertain the car's "true" value; he noted only that the car "is valued in the neighborhood of $100,000, but the actual condition as determined by an expert will determine its true value."

### B. Litigation Proceedings

On November 3, 2011, respondent filed a complaint for the unlawful impoundment and confiscation and conversion of the "1965 Ford Mustang Cobra" against the City of San Mateo and City of San Mateo Police Department (hereinafter collectively referred to as "the City"), and Sergeant Tim Sullivan. Respondent sought compensatory damages of $150,000 for the loss of the use and market value of the car, and reasonable compensation for time and money spent to recover the car as an estate asset.

On December 21, 2011, appellant filed a complaint in intervention, claiming "adversely" to both respondent and the City. Appellant sought possession of the car, also identified as a "1965 Ford Mustang Cobra," damages for the car's depreciation, and a declaration that he was the lawful owner of the car and entitled to its immediate possession and that respondent had no interest in and was not entitled to possession of the car. Both respondent and the City opposed the complaint in intervention.

On December 22, 2011, the City of San Mateo filed a cross-complaint in interpleader. It was alleged that the car, identified as a "1968 Shelby Cobra GT 500," was impounded after Officer Sullivan noticed a discrepancy in the VIN during a traffic stop. A subsequent investigation determined the car had been reported stolen in 1970 by appellant, "the original owner." After the reported theft, the "alleged/current owner, the Estate of William I. Heinicke (deceased)," purchased the car from some unknown third party. It was further alleged both appellant and respondent had submitted documents as

5

proof of their lawful title to the car, but a review of each claimant's "facts" did not show who was the lawful owner. The City took no position on the matter, and asked the court to require the claimants to litigate their rights to the car. Both appellant and respondent opposed the interpleader cross- complaint. Before trial, counsel for appellant and respondent filed trial briefs. Respondent's counsel attached to his trial brief a copy of the "pink slip" (ownership certificate) in the name of William L. Heinicke.

On May 21, 2012, a bench trial was held at which counsel for appellant and respondent appeared without their clients. The City's counsel confirmed the City did not intend to assert a position in favor of either claimant. Counsel for all parties further informed the court that the only issue to be decided was "who gets the car," neither claimant sought any monetary damages from the City and the City did not seek costs against either claimant.

The court initially addressed appellant's motion in limine to disregard any evidence of his receipt of an insurance payment pursuant to the collateral source rule. In response to the court's questions, appellant's counsel agreed that because the matter would be heard by the court, he did not have any problem with the court considering evidence of the insurance payment and then "decid[ing] on the merits . . . how that implicates or impacts" appellant's right to recover the car. Counsel was "willing to assume that the Court would disregard whatever evidence was ultimately deemed not to be admissible." The court noted it had read the parties' trial briefs and knew "there was insurance involved," and so it denied the motion in limine. Respondent's counsel then informed the court that "the parties have reached an agreement where all of the investigation materials that were produced and generated by Shawn Parks and the other officer . . . will be admitted into evidence for your Honor to consider."

After opening statements, respondent's counsel stated that neither appellant nor respondent would be calling any witnesses, and asked the court to "have our exhibits introduced," and then allow counsel to response to the court's "legal questions." Respondent's counsel further informed the court that the matter had been originally scheduled "for a long cause" because the parties had not yet reached a stipulation

6

regarding the facts. Appellant's counsel then stated, "We have stipulated to the admissibility of the police report and to the fact that the facts regarding the theft of the vehicle and the investigation are as they were stated in the police report." So, "rather than putting the officers on the stand, we're stipulating that that would be the evidence were they to testify." In response to the court's query as to whether counsel had actually "stated the stipulation," appellant's counsel replied, "All of the investigative reports that have been presented to the Court we have stipulated that they will come in without further foundation, without any hearsay objections, without any further authentication . . . and that the Court consider the investigation reports; all of them; including any followup they did as the evidence in this case." The court then admitted into evidence three photographs proffered by respondent's counsel, and a copy of the "police report" proffered by appellant's counsel. The court engaged counsel in a discussion of certain legal issues and then took the matter under submission.

In its written decision and judgment, the court stated: "This matter was assigned to this department for hearing on May 21, 2012. Although the matter had been calendared as a 'Long Cause' matter, essentially the parties stipulated to the facts and the hearing consisted of the introduction of exhibits and arguments by attorneys for all parties. [¶] The hearing lasted significantly less than 8 hours and no party requested a statement of decision before the matter was submitted. Therefore, pursuant to Section 632 of the Code of Civil Procedure, the court will not be issuing either an oral or written statement of decision. [¶] The court has reviewed all exhibits admitted into evidence and trial briefs submitted by the parties. [¶] THE COURT ENTERS JUDGMENT FOR THE PLAINTIFF/CROSS-DEFENDANT, PREMA SCOTT KEY, personal representative of the Estate of William Heinicke, deceased [,] on the complaint and cross-complaint."

## DISCUSSION

Appellant contends "the evidence unequivocally established, and [r]espondent concedes, that the Mustang was stolen from [a]ppellant," and "[r]espondent also concedes that he possessed the Mustang solely and directly as a result of its theft from [a]ppellant." Appellant then argues that "[n]otwithstanding these undisputed facts, the

7

trial court granted [r]espondent possession – and effectively ownership -- of the Mustang," which "is contrary to, and cannot be reconciled with the affirmative duty to restore the stolen Mustang to [a]ppellant, its rightful owner." As we now discuss, appellant's argument is unavailing.

We initially conclude de novo review is not appropriate in this case as the matter was not "submitted on stipulated facts reflected solely in uncontradicted documentary evidence," as appellant argues. The parties stipulated only that the court was to consider the statements recited in the police investigation report with the caveat that if the police officers were called to testify as witnesses they would confirm the statements that were contained in the document. Additionally, at trial respondent's counsel specifically urged the court to consider, among other things, that "in terms of title, there has been no proof that [appellant] had title to this car or has any evidence of title to this car. There's evidence that [respondent's father] has title to the car." Thus, despite appellant's argument to the contrary, the record does not contain admissions by respondent's counsel compelling the trial court to decide that appellant was entitled to possession of the car. (See *Smith v. Walter E. Heller & Co.* (1978) 82 Cal.App.3d 259, 269 [an admission " 'is a conclusive concession of the truth of a matter which has the effect of removing it from the issues' "].)

Consequently, "[o]ur consideration of the issue whether the judgment [is] supported by substantial evidence is governed by the well-established standard of review applicable to any claim that a judgment or finding is not supported by the evidence in the record. Under that standard, we must consider all of the evidence in the light most favorable to the prevailing party giving it the benefit of every reasonable inference, and resolving conflicts in support of the judgment. [Citations.] [¶] It is not our task to weigh conflicts and disputes in the evidence; that is the province of the trier of fact. Our authority beings and ends with a determination as to whether, on the entire record, there is *any* substantial evidence, contradicted or uncontradicted, in support of the judgment. . . . We must accept as true all evidence and all reasonable inferences from the evidence tending to establish the correctness of the trial court's findings and decision,

8

resolving every conflict in favor of the judgment." (*Howard v. Owens Corning* (1999) 72 Cal.App.4th 621, 630-631.) These rules "will obtain even though to some triers of fact the evidence in the instant case would have seemed so improbable, impossible and unbelievable that a judgment contrary to that now on appeal would have inevitably followed." (*Romero v. Eustace* (1950) 101 Cal.App.2d 253, 254.)

To the extent appellant asks us to consider certain statements made by the court during the trial or in its written decision that preceded its judgment, in support of his assertion of error, we are precluded from doing so. (*In re Marriage of Ditto* (1988) 206 Cal.App.3d 643, 647 (*Ditto*).) Because the parties did not request a formal statement of decision, "we must assume the court made whatever findings [were] necessary to sustain" the judgment. (*Michael U. v. Jamie B.* (1985) 39 Cal.3d 787, 792-793, superseded on other grounds by statute as stated in *In re Zacharia D.* (1993) 6 Cal.4th 435, 448.) "A statement of decision allows the trial court to review its memorandum of intended decision and 'to make . . . corrections, additions or deletions it deems necessary or appropriate.' [Citation.] Such statement thus enables a reviewing court 'to determine what [law] the trial court employed . . . .' [Citation.] It is the statement of decision which allows the court to place upon *the record* its view of facts and law of the case. [Citation.] A failure to request a [statement of decision] results in a waiver of such findings." (*Ditto, supra,* 206 Cal.App.3d at p. 647.) "Because a statement of decision was not requested, the trial court did not have the opportunity to amend; the judgment therefore governs" and "it will be presumed on appeal that the trial court found all facts necessary to support the judgment." (*Id.* at pp. 648, 649.) Thus, the only issue before us is whether there is " 'substantial evidence' to support the [trial] court's 'implied findings.' " (*In re Marriage of Hebbring* (1989) 207 Cal.App.3d 1260, 1274.)

In light of our limited power of review, we conclude there was substantial evidence supporting the court's judgment. The police investigation report indicates that appellant did not produce any ownership documents for the car (albeit offering an explanation for his failure to do so). Rather, it was respondent who produced prima facie evidence of Heinicke's ownership of the car: the car registration in Heinicke's name, the

9

"pink slip" (ownership certificate) listing a VIN that matched the VIN plate in the car and the attached rear license plate, and a verification of vehicle form completed by a California Highway Patrol officer. (See, e.g., *Caccamo v. Swanston* (1949) 94 Cal.App.2d 957, 964 [although not conclusive on the subject, a "certificate [of registration of vehicle] is evidence of title"]; *Getz v. Whisenant* (1949) 93 Cal.App.2d 182, 185 ["ownership certificate [pink slip] and the registration card which stated that the claimants were the legal and registered owners of the automobile" constituted prima facie evidence of ownership].) Given the prima facie evidence of Heinicke's ownership of the car, and aided by the presumptions that "[t]he things which a person possesses are presumed to be owned by him" (Evid. Code, § 637) and "[a] person who exercises acts of ownership over property is presumed to be the owner of it" (Evid. Code, § 638), the trial court could reasonably find that respondent had demonstrated his right to possess the car as against appellant's claim. The effect of the Evidence Code presumptions, which affect the burden of producing evidence, is that the court, as the trier of fact, is required "to assume the existence of the presumed fact unless and until evidence is introduced which would support a finding of its nonexistence, in which case the trier of fact shall determine the existence or nonexistence of the presumed fact from the evidence and without regard to the presumption[s]. [However,] [n]othing . . . prevent[s] . . . [the trier of fact from] drawing . . . any inference that may be appropriate." (Evid. Code, § 604.) The police officers' opinions calling into question the validity of respondent's ownership documents and their conclusions that the impounded car was not a 1965 Mustang, but a 1968 Mustang that had been previously owned and reported stolen by appellant, tended to rebut the Evidence Code presumptions. Nevertheless, the trial court was free to reject the police officers' opinions and conclusions, even if uncontradicted. An expert's evidence is conclusive "to the extent that it may not be contradicted by" a nonexpert. (*Liberty Mutual Ins. Co. v. Industrial Acc. Com.* (1948) 33 Cal.2d 89, 95.) However, an expert's evidence "is not conclusive in the sense that it must be accepted as true." (*Id.*) It "is really an argument of an expert to the [trier of fact], and is valuable only in regard to the proof of the facts and the validity of the reasons advanced for the conclusions. [Citation.]

10

The weight to be given to the opinion of an expert depends on the reasons he [or she] assigns to support that opinion." (*People v. Martin* (1948) 87 Cal.App.2d 581, 584.) Moreover, "[i]t is well settled that the trier of fact may accept part of the testimony of a witness and reject another part even though the latter contradicts the part accepted. [Citations.] As [the court] said in *Nevarov v. Caldwell* (1958) 161 Cal.App.2d 762, 777, '[the trier of fact] properly may reject part of the testimony of a witness, though not directly contradicted, and combine the accepted portions with bits of testimony or inferences from the testimony of other witnesses thus weaving a cloth of truth out of selected available material. [Citations.]' " (*Stevens v. Parke, Davis & Co*. (1973) 9 Cal.3d 51, 67-68.) " 'When the evidence is conflicting, it will be presumed that the [trial] court found every fact necessary to support its order that the evidence would justify. So far as it has passed on the weight of evidence . . ., its implied findings are conclusive. This rule is equally applicable whether the evidence is oral or documentary.' " (*Griffith Co. v. San Diego Col. for Women* (1955) 45 Cal.2d 501, 507-508.) Appellant essentially asks us to reweigh the evidence and the reasonable inferences that could be drawn therefrom and substitute our judgment for that of the trier of fact. We decline to do so.

We also conclude the judgment may be upheld on the ground that the trial court could have found appellant had failed to establish he was entitled to possession of the car in 2011. After the reported theft in February 1970, appellant confirmed the value of the stolen car and that his insurer paid him a sum of between $3,500 to $5,000 under his policy of insurance for the loss of the car. Appellant made neither an allegation nor proffered evidence that the insurer's payment for the loss of the car was not for the fair market value of the vehicle at the time of the loss in 1970. He argued only that "[a]s a rare collector's item, the Mustang has appreciated in value since [1970] . . . and is estimated to be valued in excess of $100,000," and therefore, the payment of the fair market value of the car in 1970 was only a partial compensation for his loss, giving him now a right of action to recover possession of the vehicle in 2011. However, the trial court could reasonably infer from the proffered evidence that appellant's receipt of the fair market value of the car in 1970 resulted in full compensation for the loss of the car,

11

thereby extinguishing his right to recover the car. (See *21st Century Ins. Co. v. Superior Court* (2009) 47 Cal.4th 511, 534 [conc. opn. by Werdeger, J. ["an insured should not obtain double recovery by obtaining (and retaining) payment for the same loss from both its insurer and a tortfeasor"]; *Helfend v. Southern Cal. Rapid Transit Dist.* (1970) 2 Cal.3d 1, 11, fn. 15 (*Helfend*); *Anheuser-Busch, Inc. v. Starley* (1946) 28 Cal.2d 347, 355 [dis. opn. of Traynor, J.], cited with approval in *Helfend, supra*, at p. 11, fn. 17; *Ferraro v. Southern Cal. Gas. Co.* (1980) 102 Cal.App.3d 33, 41 (*Ferraro*), disapproved on other grounds in *Goodman v. Lozano* (2010) 47 Cal.4th 1327, 1330, 1336-1337.)

In reaching our decision, we see no merit to appellant's argument that his receipt of an insurance payment was inadmissible under the collateral source rule in the circumstances of this case. "The collateral source rule states that 'if an injured party receives some compensation for his injuries from a source wholly independent of the tortfeasor, such payment should not be deducted from the damages which the plaintiff would otherwise collect from the tortfeasor.' " (*Howell v. Hamilton Meats & Provisions, Inc.* (2011) 52 Cal.4th 541, 551.) "The collateral source rule expresses a policy judgment in favor of encouraging citizens to purchase and maintain insurance for personal injuries and for other eventualities. Courts consider insurance a form of investment, the benefits of which become payable without respect to any other possible source of funds. If we were to permit a tortfeasor to mitigate damages with payments from plaintiff's insurance, plaintiff would be in a position inferior to that of having bought no insurance, because his payment of premiums would have earned no benefit. Defendant should not be able to avoid payment of full compensation for the injury inflicted merely because the victim has had the foresight to provide himself with insurance." (*Helfend, supra*, 2 Cal.3d at p. 10.) Nevertheless, "[a]lthough the strong adherence of California courts to the collateral source rule cannot help but be recognized, in this case there is the competing interest, also well recognized by our courts, that a defendant may not be subjected to double liability. While the court in *Helfend* made clear that a plaintiff is not to be penalized for his own providence, it also emphasized that '[i]n reaffirming our adherence to the collateral source rule in this tort case involving a plaintiff with collateral payments from

12

his insurance coverage, we do not suggest that the tortfeasor be required to pay doubly for his wrong — once to the injured party and again to reimburse the plaintiff's collateral source . . . .' (*Helfend . . ., supra*, 2 Cal.3d [at p.] 11, fn. 15.)" (*Ferraro, supra*, 102 Cal.App.3d at p. 46.) "Despite the unusual posture — a suit by [an insured-]subrogor against a tortfeasor in which the [insurer-]subrogee is not joined and has not sought intervention — the rule against double liability must still predominate. Accordingly, the payment of . . . insurance proceeds in this case, . . . cannot be considered 'collateral source' recovery. On the contrary, a collateral source is one ' "wholly independent of the tortfeasor." ' [Citation.] Therefore, since '[t]o subrogate is to put in the place of another; to substitute' [citation], when an insurance carrier becomes subrogated to the claim of an insured against a third party tortfeasor, the payment of insurance payments is no longer a 'collateral source.' To characterize appellant's receipt of the [insurance proceeds] as a collateral source payment would violate the rule against double recovery, since both the subrogee and the subrogor have a right of action against the tortfeasor. The tortfeasor would have potential double liability if payment of insurance benefits by the subrogee to the subrogor is allowed to be designated a 'collateral source.' " (*Id.* at p. 47.)[1]

---

[1]     Appellant's reliance on *Lebet v. Cappobiancho* (1940) 38 Cal.App.2d Supp. 771 (*Lebet*) is misplaced. In that case, the plaintiff sought to recover moneys for the damage to his car after being fully compensated for the damage by his insurer. (*Id.* at p. 771.) On appeal, the defendants argued the insurer had become subrogated to all of the plaintiff's rights and was the real party in interest under Code of Civil Procedure section 367, and therefore was the only party entitled to prosecute the action. (*Ibid.*) In rejecting the defendants' contention, the court held that the plaintiff had the right to maintain the action and the defendants' satisfaction of any judgment in favor of the plaintiff would protect the defendants from any claim by the insurer. (*Id.* at p. 772.) However, the *Lebet* court did not address "[a]n adjunct of subrogation," which is "the rule prohibiting double recovery of damages, a rule of special importance in the prosecution of subrogation claims because the proration of damages among those who have shared the costs of personal injuries increases the possibility of duplicate claims for the same loss. Only one totality of recovery of damages for personal injuries is allowed, and only one totality of liability may be imposed on the tortfeasor. [Citations.] Duplicate recovery of damages is barred, and neither double recovery of the same item of loss nor double liability for the same item of injury is permitted." (*Ventura County Employees' Retirement Association v. Pope* (1978) 87 Cal.App.3d 938, 951.)

13

We are not persuaded by appellant's argument that reversal is required because the trial court should have applied the legal maxims that "[t]itle to a stolen vehicle remains with the rightful owner," "any claim to the title derived from the thief is void as a matter of law," and "one cannot be a bona fide purchaser of a stolen vehicle." There was a four-month gap between the report of the theft and the purchase of the vehicle by Heinicke, during which time the status and condition of the car are unknown. Nor was there any evidence proffered from which the trial court was required to find that appellant had retained title to the car at the time it was purchased by Heinicke, that Heinicke had either stolen the car or purchased the car from a thief, or that Heinicke had reason to suspect the car had been stolen based on its condition at the time it was purchased in June 1970. Consequently, appellant's argument seeking application of the aforenoted legal maxims fails for lack of a factual predicate in the record. [2]

In sum, we conclude appellant has failed to demonstrate that the trial court erred in awarding possession of the car to respondent. According, we affirm the judgment in favor of respondent.[3]

---

[2]     In light of our determination, we need not address appellant's contention that he made a timely claim for possession of the car.

[3]     However, we deny respondent's motion to dismiss the appeal and for sanctions on the ground that the appeal was frivolous. Sanctions "should be used most sparingly to deter only the most egregious conduct." (*In re Marriage of Flaherty* (1982) 31 Cal.3d 637, 651.) After a review of the record, we have determined that imposing sanctions is not appropriate in this case.

## DISPOSITION

The judgment is affirmed.  Respondent Prema Scott Key is awarded costs on appeal.

_____
Jenkins, J.

We concur:


_____
McGuiness, P. J.


_____
Pollak, J.