72 Cal.Rptr.3d 275 (2008)
159 Cal.App.4th 1313
Randall L. GOODMAN et al., Plaintiffs and Appellants,
v.
Jesus LOZANO et al., Defendants and Respondents.
Nos. G036774, G037091.
Court of Appeal of California, Fourth District, Division Three.
February 8, 2008.
*276 Silverstein & Huston, Steven A. Silverstein, Mark W. Huston and Robert I. Cohen for Plaintiffs and Appellants.
Law Offices of Craig D. Weinstein and Craig D. Weinstein, Manhattan Beach; Spierer, Woodward, Corbalis & Goldberg and Stephen B. Goldberg for Defendants and Respondents.

OPINION
MOORE, J.

I. INTRODUCTION,
This appeal requires us to deal with two issues that arise out of sections 877 and 1032 of the Code of Civil Procedure.[1] Section 877 reduces a litigant's "claims" against remaining "tortfeasors claimed to be liable for the same tort" or against "one or more other co-obligors mutually subject to contribution rights," by the amount of prior settlements from those tortfeasors, or co-obligors (as the case may be). Section 1032 sets out four categories of litigants who are entitled to "prevailing party" status, including "the party with a net monetary recovery." In situations other *277 than those four categories, the trial court has discretion to determine the prevailing party.
The first issue implicates only section 877: In a two-person partnership devoted to building residential property where, in a construction defect case, the "construction partner" pays $200,000 to the plaintiff to be dismissed, the case goes to trial against "money partner," and the court awards less than $200,000 against the money partner, should the $200,000 paid by the construction partner be used to offset the award against the money partnerresulting, in effect, in a net zero judgment? The answer is yes. The analysis is straightforward. The settling construction partner was a "co-obligor mutually subject to contribution rights" under California partnership law, specifically section 16306, subdivision (a) of the Corporations Code, and therefore the plaintiffs claim had be reduced by the $200,000 paid in settlement.
The second issue involves the interplay of both section 877 and section 1032: Where a plaintiff obtains a net zero judgment as a result of the operation of section 877, is that plaintiff nevertheless entitled to prevailing party status because that party was "the party with a net monetary recovery"? The answer is no. Again, the analysis is straightforward. A litigant cannot actually recover or "gain" anything without an order or a judgment. An award or verdict without a judgment is merely symbolic. The fact that the litigant may have had an award or verdict prior to a zero judgment is meaningless for purposes of whether that litigant qualifies as "the party with a net monetary recovery" if the award or verdict produces nothing tangible. "Recovery," not "award," is the word chosen by the Legislature.
This straightforward analysis, based on the plain meaning of the words actually used in the statute, vindicates Justice Mihara's dissent in Wakefield v. Bohlin (2006) 145 Cal.App.4th 963, 52 Cal.Rptr.3d 400 (Wakefield). Alas, it also forces us to disagree with the majority opinion in Wakefield, and explain why several other cases followed by the Wakefield majority also erred. The essential problem is that the Wakefield majority substituted its own words for the actual words in the statute. The statute says "recovery." It does not say "award" or "verdict."

II. BACKGROUND
In March 2000, Randall Goodman and Linda Guinther contracted with Jesus and Natalia Lozano to purchase a newly constructed home in Laguna Beach for $1.25 million. The home was built by AMPM Construction, which was formed by Alberto Mobrici and his wife Patricia Mobrici in 1996. The Mobricis were 50/50 partners with the Lozanos in a number of residential construction projects. The Lozanos were the money partners while the Mobricis were the "construction arm of that venture."
In 2001 Goodman and Guinther sued the Lozanos, Alberto Mobrici, AMPM Construction, the architect, and the real estate brokers based on various construction defects in their new home. While various causes of action were alleged against the several defendants (including negligence, fraud, breach of warranties and negligent misrepresentation), only the Lozanos were sued for breach of contract, based on the theory that the house deviated from the contract in a number of particulars.
In 2004, Alberto Mobrici and AMPM Construction settled with Goodman and Guinther for $200,000. Other defendants paid lesser amounts, totaling about $30,000, except for the Lozanos, who didn't settle at all. (The Lozanos did make a *278 "998 offer" to settle for $35,000, which was turned down.) In September 2003 the Mobricis obtained an order declaring their settlement to have been in good faith.
The case against the Lozanos went to a court trial in 2005. Because of the possibility under section 877 that amounts already paid to Goodman and Guinther might reduce any award obtained by them against the Lozanos, the trial judge was (properly) not informed of those amounts.[2] In a thorough minute order dated April 14, 2005, the trial judge went item by item through the various alleged deviations from the contract and the various construction defects and calculated a "total damage award" of just a little less than $146,000.
The next month the trial judge learned of the prior settlements totaling $230,000. The focus of the case shifted to the question of whether the Lozanos should receive credit for the prior settlements. The trial judge determined that they should. Since the $230,000 in prior settlements obtained by Goodman and Guinther easily exceeded the $146,000 awarded to them, the judge signed a judgment prepared by the Lozanos providing that Goodman and Guinther should take nothing by the action.
That left the question of who, exactly, had "prevailed" for purposes of an award of costs and attorney fees. In another thorough minute order, the trial judge self-consciously exercised his discretion under subdivision (a)(4) of section 1032 (which defines exactly who is a "prevailing party") to determine that it was the Lozanos who were the prevailing parties, because they would pay nothing under the judgment.
The judge illustrated his decision by posing the question of how each side might have answered the question from friends or neighbors, "How'd that trial come out?" The Lozanos, the trial judge postulated, would probably have answered, "Great! We don't have to pay a thing." Goodman and Guinther, on the other hand, probably. would have said, "Bad. We didn't get anything because the judge missed the point on our damages and got it all wrong."
The trial judge also buttressed the exercise of his discretion by pointing out the risks that Goodman and Guinther had taken in "spurn[ing] the offer of a further $35,000" when they had already collected more than $230,000. The upshot was that the minute order provided for an award of $132,000 in attorney fees and another $12,000 in costs to the Lozanos.[3]
Plaintiffs Goodman and Guinther have appealed from both the net zero judgment (G036774) and the subsequent order determining the Lozanos to be the prevailing parties and awarding them attorney fees (G037091).

III. THE NET ZERO JUDGMENT
Goodman and Guinther argue that the trial court erred in offsetting the $230,000 received in prior settlements against their award from the Lozanos of $146,000, resulting in the net zero judgment. Their analysis goes like this: Only *279 the Lozanos were sued for breach of con, tract, and the award on their contract claims was $64,000. (On the tort side, there was an $82,000 award for construction defects.) The defendants who contributed to the $230,000 in prior settlements, by contrast, settled only tort claims brought against them by Goodman and Guinther. Looking just at the contract side of the equation, then, shows that Goodman and Guinther were given a net award of $64,000.
Here is the text of the introductory paragraph and subdivision (a) of section 877, which is the part of the statute that sets up the offset mechanism: "Where a release, dismissal with or without prejudice, or a covenant not to sue or not to enforce judgment is given in good faith before verdict or judgment to one or more of a number of tortfeasors claimed to be liable for the same tort, or to one or more other co-obligors mutually subject to contribution rights, it shall have the following effect: [¶] (a) It shall not discharge any other such party from liability unless its terms so provide, but it shall reduce the claims against the others in the amount stipulated by the release, the dismissal or the covenant, or in the amount of the consideration paid for it whichever is the greater." (Italics added.)
The question we must now answer is whether the Mobricis and AMPM Construction, whose $200,000 settlement easily exceeded either the $146,000 total award or the asserted $64,000 contract award, were "one or more other co-obligors mutually subject to contribution rights."
There was substantial evidence, ironically brought out by Goodman and Guinther's trial counsel, that the Lozanos and the Mobricis were in a general partnership. Alberto Mobrici testified that the Mobricis met Jesus Lozano in 1989 or 1990, and formed an oral business "relationship" where they would buy residential propertiesthe two of them "built" about seven or eight homes. Their agreement was: "Mr. Lozano would provide the money to build; and the profits, we would share them 50-50." Mobrici was the "construction arm of that venture."
Corporations Code section 16306, subdivision (a) provides: "(a) Except as otherwise provided in subdivisions (b) and (c), all partners are liable jointly and severally for all obligations of the partnership unless otherwise agreed by the claimant or provided by law." (Italics added.) Neither subdivisions (b) or (c) are applicable to this case, and there is nothing in this record that Goodman and Guinther ever agreed that that the Mobricis would not be liable for liabilities incurred by the Lozano-Mobrici partnership.[4]
Thus semantically, Corporations Code section 16306 fits this case exactly. Courts regularly characterize partners liable for a partnership debt as "co-obligors" subject to contribution rights. (E.g., Great Western Bank v. Kong (2001) 90 Cal.App.4th 28, 33, 108 Cal.Rptr.2d 266 ["As a partner, appellant is liable for his proportionate share of the sums the other partners actually paid toward the partnership debt.... Thus, respondents are entitled to contribution from appellant."]; Goldring v. Chudacoff (1936) 15 Cal. App.2d 741, 741, 60 P.2d 135 ["The partner who pays more than his share of partnership debts is entitled to contribution from his copartner."].)
*280 An on-point example of the ruleand one that illustrates how the Mobricis were indeed liable for damages for breaches of contract incurred by the Lozanosis to be found in Gardiner v. Gaither (1958) 162 Cal.App.2d 607, 329 P.2d 22 (Gardiner). Indeed, Gardiner, like the present case, arose out of the same sort of "money-construction" partnership that the Lozanos and Mobricis had.
Gardiner began with an existing partnership of three men, two of whom were realtors. This three-man entity entered into a contract with two licensed contractors, which the trial court would later hold (and the appellate court would affirm) itself created a five-man partnership to engage in the building of five houses. However, the project encountered problems with foundations and retaining walls, and three of the five houses were scrapped. The two contractors of the five-man partnership eventually filed for bankruptcy. Meanwhile, unpaid suppliers and subcontractors filed mechanics' liens against the property, and assigned their claims to an attorney (plaintiff Gardiner). The court held that it made no difference that the suppliers and subcontractors were not aware of the original group of three men in the five-man partnershipthe three men could still be held liable for the work and supplies. (Gardiner, supra, 162 Cal. App.2d at p. 618, 329 P.2d 22.) In particular, the court said, "Appellants [the original three men] place some reliance on the provision [in the contract that created the five-man partnership] that neither contracting party was to be liable the debt, default, undertaking, contract or tort of the other. Whatever effect such provision may have had as between the partners themselves, it can have no effect on the partners' liability to third persons." (Id. at p. 617, 329 P.2d 22.)
In the case before us now, Goodman and Guinther point out that Gardiner used an estoppel theory that a "secret partner" may not deny liability for a partnership debt solely on the ground that the creditor was unaware of that partner, and did not discuss the application of section 877 to a verdict. (Which is truesection 877, enacted in 1957, was less than a year old when Gardiner was decided in late 1958.) But that does not make the case any less illustrative of a partner's obligation for partnership debts.
Let us assume, for example, that Goodman and Guinther had never sued the Mobricis or AMPM Construction at all that this was a simple plaintiff versus one defendant (Jesus Lozano) case, that the court awarded the plaintiff $146,000, and that the $146,000 was reduced to an enforceable judgment. Would there be any doubt, on the evidence of a partnership adduced in this trial, that the Mobricis would have been "subject to contribution rights" of the Lozanos for that amount?
But the applicability of section 877 here is not just semantic. One of the purposes of section 877 is to avoid double recovery by the plaintiff. (E.g., Reed v. Wilson (1999) 73 Cal.App.4th 439, 444, 86 Cal.Rptr.2d 510 ["In addition, the offset provided for in section 877 assures that a plaintiff will not be enriched unjustly by a double recovery, collecting part of his total claim from one joint tortfeasor and all of his claim from another."]; Bostick v. Flex Equipment Co., Inc. (2007) 147 Cal. App.4th 80, 111, 54 Cal.Rptr.3d 28 (con. opn. of Croskey, J.) ["one of the purposes of the setoff requirement in particular is to avoid an unjust double recovery"].)
In this case, failure to offset the $146,000 award against the Lozanos by at least the $200,000 prior settlement from their partners the Mibricis would have resulted in just such a double recovery for *281 the plaintiffs. Under the facts before us, none of the $146,000 in damages assessed against the Lozanos were the result of any actions independent of the Lozano-Mobrici partnership, or the Mobricis' own construction work. The trial judge arrived at the $146,000 figure by going item by item through a long report prepared by the Brunnel construction consulting firm, determining whether the evidence and the problem justified an award, and, if it did, then assigning a repair price, usually the number recommended in the report. (The court, for example, rejected claims for skylights that supposedly were not part of the plans since that claim only "raised triviality to new heights.") Thus no damages were ultimately awarded against the Lozanos that could not ultimately be traced back to some failure on the Mobricis in their performance of duties arising out of the Lozano-Mobrici partnership.
The trial court also did not neatly divide the award into two segments of $64,000 for contract and $82,000 for tort, as Goodman and Guinther have assumed. That division is merely the product of the fact that the trial litigation was organized around the Brunnel firm's report, and the trial court simply went down the line on each item. In its minute order the trial court specifically found that that the plaintiffs "had a single, joint claim for one indivisible series of losses allegedly incurred in regard to the residence which they jointly purchased and owned." (Italics added.) To reiterate, any liability which the Lozanos might have incurred in this case for either the "deviations" from the formal contract or other "defects" in construction was a result of the Mobricis' bad construction. Had the trial court not offset the $146,000 by the $200,000 already paid by the Mobricis, there would have been a clear double recovery for the damages incurred by the plaintiffs for that bad construction, whether it merely deviated from the contract or was defective in itself.

IV. THE "PREVAILING PARTY" ISSUE

IN THE LIGHT OF THE

NET ZERO JUDGMENT

A. The Problem Presented By the Wakefield Majority Opinion

As seen above, the trial court exercised its discretion to judge the Lozanos, who didn't "have, to pay a thing" as the "prevailing party." There can be no doubt that, tested on abuse of discretion standard, the trial court's decision was reasonable and must be upheld under such a standard. No one can dispute that at least reasonable minds may consider a defendant who walks away from litigation with a net zero judgmentnot having to "pay a thing," as the trial judge put itto have prevailed.
However, after the trial court's decision, a divided panel in the Sixth District in Wakefield, supra, 145 Cal.App.4th 963, 52 Cal.Rptr.3d 400 issued a decision which "categorically" precludes the exercise of discretion in circumstances such as this case (namely, a positive award to the plaintiffs, but completely offset in the judgment because of the operation of section 877), and makes the plaintiff the prevailing party as a matter of law. (See id. at p. 969, 52 Cal.Rptr.3d 400 [plaintiff "categorically qualifies as a prevailing party"].) If the Wakefield majority is correct, then we would be forced to conclude that the trial judge here erred as a matter of law by exercising discretion he did not have. Under Wakefield, Goodman and Guinther are "categorically" the prevailing parties based on a positive award, even if they obtained a zero judgment.
*282 The facts in Wakefield are remarkably similar to the case at hand. The Bohlins, real estate entrepreneurs (the equivalent of the Lozanos here) had a new home built on an existing lot and sold it to a buyer (Wakefield, the equivalent of Goodman and Guinther here). The buyer discovered various construction defects, and sued not only the entrepreneurs, but the realtors and plasterers. Like here, all defendants settled except for the real estate entrepreneurs. Like here, the size of the monies collected in settlement (a total of $45,000 from the realtors and $51,700 from the plasterers) dwarfed the amount eventually awarded in damages ($33,950). Like here, the judgment provided that the plaintiff would take nothing. Like here, the trial court determined the defendants to be the prevailing parties and awarded attorney fees and costs to the defendants. (There were, though, a few minor differences: Unlike here, the case was tried to a jury, and unlike here, the claim on which the damages were awarded was a tort claim for negligent misrepresentation instead of construction defects qua construction defects. (See Wakefield, supra, 145 Cal. App.4th at pp. 970-971, 52 Cal.Rptr.3d 400.) Also, unlike here, the disappointed plaintiff did not challenge the net zero judgment, but confined his attack to the attorney fees and cost order. (See id. at p. 972, 52 Cal.Rptr.3d 400.))

B. The Text of Section 1032

Since the "prevailing party" issue, both in this case and in Wakefield revolves around the actual language in section 1032, we will use this opportunity to set forth the entirety of the statute in a footnote[5] and discuss that text now. The operative portion of the statute is mostly in subdivision (a)(4); subdivisions (a)(1)-(a)(3) are solely definitional. Overall, subdivision (a)(4) is divided into listing four categories, which, if a party falls into `any of them, the party is automatically a prevailing party as a matter of law. After the four categories, there are rules by which the court "shall" exercise its discretion to determine the prevailing party where no party falls into one of the four mandatory categories.
Like a leaf falling, we can quote the statute vertically in such a way that its categories and rules become readily visible:
"(4) `Prevailing party' includes
"[1] the party with a net monetary recovery,
"[2] a defendant in whose favor a dismissal is entered,
*283 "[3] a defendant where neither plaintiff nor defendant obtains any relief, and
"[4] a defendant as against those plaintiffs who do not recover any relief against that defendant.
"[¶] When
"[a] any party recovers other than monetary relief and
"[b] in situations other than as specified,
"the `prevailing party' shall be as determined by the court,
"and under those circumstances [i.e., when the "prevailing party" shall be determined by the court"],
"the court, in its discretion, may allow costs or not
"and, if allowed
"[¶] may apportion costs between the parties on the same
"[¶] or adverse sides
"pursuant to rules adopted under Section 1034."[6]
For our purposes, what is clear from this structure is that unless Goodwin and Guinther (in the Wakefield case it was the plaintiff Wakefield) fall into the category "the party with a net monetary recovery," the question of who was the prevailing party would be a matter for trial court discretion, and the trial court's determination, being at least reasonable, would necessarily have to be upheld.

C. A Detailed Analysis of the Wakefield Decision

Now, back to the Wakefield majority opinion:
The Wakefield majority began its analysis of the prevailing party issue on page 975 of volume 145 the official reporter. (All specific page references to the Wakefield opinion will be to the page in the official reporter, though it should be noted that as of this writing we have only the advance sheet version; changes in the Wakefield opinion as a result of page proofs for the hard bound version might alter the pagination slightly.)
The first part of that analysis spans from pages 975 through 977, which basically only outlines the structure we have just discussed. There is nothing on these pages with which one might reasonably disagree. Pages 978 and 979 are likewise preliminary. Page 978 merely sets out the standard of review (de novo, because the court is concerned with `"whether the criteria' " for a statutory award "`have been satisfied'") and defines the issue. (With the exception of telegraphing the court's conclusion at the bottom of page 978, again, there is nothing on the page with which one might take exception.) Page 979 covers the basic operation of section 877; including a recognition (from language we have already quoted from Reed v. Wilson), that among the purposes of section 877 is the prevention of unjust "double recovery."
The majority's substantive analysis begins on page 980 of the opinion, and culminates in the conclusion on page 983 that it was the plaintiff, Wakefield, who, despite obtaining a net zero judgment, was "Categorically ... the prevailing party, entitled to costs as a matter of right." The rest of the opinion are the conclusions that follow in that wake.
On pages 980 through 983, the Wakefield majority undertakes to show that the *284 plaintiff could have a "zero" judgment even if that plaintiff "failed to obtain a net monetary recovery." (Wakefield, supra, 145 Cal.App.4th at p. 980, 52 Cal.Rptr.3d 400, original italics.) The majority then sets forth their analysis based on three distinct rationales, considered in this order: (1) the current statutory language of section 1032, (2) a comparison of the most recent version of the statute with a prior version, and (3) case law. In analyzing the Wakefield majority opinion and its reasoning, we will follow that same structure.

1. The Wakefield Majority's Treatment of the Statutory Language
It is not before one is 11 pages into the Wakefield majority opinionin four paragraphs spanning pages 980 and 981 under the heading "Current statutory language"that one encounters the essential error in the Wakefield majority analysis. That error consists of equating, without support in semantics or logic, the word "recovery" with the words "award" and "verdict." There is, as we acknowledge and explain anon, support for such an equation in prior case law, but that case law was itself deficient because it read concepts into a statute that simply are not there in the actual language.
Let us now explain. The Wakefield majority devoted only those four paragraphs to analyzing and applying the actual language of section 1032 to the facts before it. The first of those paragraphs merely introduces the problem of which party was "the party with a net monetary recovery." (Wakefield, supra, 145 Cal.App.4th at p. 980, 52 Cal.Rptr.3d 400.)
The second paragraph begins the court's substantive analysis by considering words "net monetary" in a vacuum, divorced from the word "recovery." The paragraph opens with the sentence, "The first part of the pertinent statutory phrase'net monetary'comes into play in situations when parties on both sides of the litigation have damage claims against each other." (Wakefield, supra, 145 Cal.App.4th at p. 980, 52 Cal.Rptr.3d 400, italics added.) The balance of the paragraph merely establishes the truism that, when two parties have competing damage claims against each other, the net winner will be the prevailing party. (At least under ordinary circumstancesthe paragraph doesn't deal with the section 877 offset problem.) The three cases cited in the paragraph, Michell v. Olick (1996) 49 Cal.App.4th 1194, 57 Cal.Rptr.2d 227 (Michell),[7]Biren v. *285 Equality Emergency Medical Group, Inc. (2002) 102 Cal.App.4th 125, 125 Cal. Rptr.2d 325 (Biren),[8] and Hansen v. Covell (1933) 218 Cal. 622, 24 P.2d 772,[9] merely illustrate that truism. One must remember, though, that in each of those cases there was no dichotomy between the netted out awards and the eventual judgments. None of those cases dealt with the operation of section 877 upon section 1032's "net monetary judgment" language (or even the predecessor "judgment in his favor" language).
It is in the third paragraph of the Wakefield majority's analysis that the majority takes a seriously wrong turn. The second sentence of that paragraph directly equates the word "recovery" with the word "award." The sentence reads: "As generally understood, the term `recovery' is broad enough to encompass any damage award." (Wakefield, supra, 145 Cal. App.4th at p. 980, 52 Cal.Rptr.3d 400.)
We cannot agree with that sentence. In cases where section 877 properly applies, a positive award may still not result in a positive judgment, and it is only by enforceable judgments or orders that there can be any meaningful recovery. In a case like this oneor Wakefield for that matter where the net zero judgment was unchallengedthe plaintiff gains literally nothing except perhaps for a moral recognition that the plaintiff had a viable claim to be begin with. Then again, the offset language in section 877 is predicated on the idea that the plaintiff begins the litigation with sufficiently viable claims to be able to garner substantial settlements from mutual tortfeasors or co-obligors.
And, to repeat, it is a gross distortion of the word "recovery" to say that it applies in a situation where a plaintiff literally walks away with nothing by way of the judgment. Justice Mihara's dissenting opinion, of course, pointed that out, and the majority did not answer the problem of any difference between the idea of a "judgment" and the idea of a "verdict"indeed, it didn't even address that difference except by way of an ipse dixit in a footnote. (See Wakefield, supra, 145 Cal.App.4th at p. 992, 52 Cal.Rptr.3d 400 (dis. opn. of Mihara, J.), we will point out the ipse dixit in the next section of this opinion.) Indeed, *286 we are aware of no provision in the enforcement of judgment statutes (§ 680.010 et seq.) that allow a litigant to obtain anything based merely on a verdict or award that has not been reduced to a judgment or order.
The only authority the Wakefield majority offered for its equation was a "cf." cite (from the Latin, confer, meaning "compare with")[10] to (People v. Reis (1888) 76 Cal. 269, 279, 18 P. 309), and that was merely for the proposition that the word recovery is "broadly construed, consistent with `its ordinary and popular meaning.'" To be sure, that proposition is correct. Even so, it did not advance the thesis advanced by the Wakefield majority. The ordinary meaning of recovery surely entails the idea of reobtaining something a litigant had to begin with. The Legislature obviously did not mean "recovery" in some off-beat metaphorical sense of "moral victory" based on a subjective vindication in one part of a case or claim within a case.
In fact, one of the cases the Wakefield majority cited in the previous paragraph, Michell, supra, 49 Cal.App.4th 1194, 57 Cal.Rptr.2d 227, contradicts any such application of the word "recovery" to intangible, moral victories. In Michell, the appellate court held that the trial judge erred by equating one monetarily insignificant but emotionally hard fought claima pushing incident at a vending machine of all thingswith victory in the whole case. It is self-evident (and certainly supported by Michell) that the Legislature did not intend "the party with a net monetary recovery" to be equated with any party who can subjectively claim moral victory.
The Wakefield majority then followed its equation of "recovery" with "award" or "verdict" with a quotation from Dunne & Gaston v. Keltner (1975) 50 Cal.App.3d 560, 564, 123 Cal.Rptr. 430. The quotation, however, did not support the thesis advanced in the previous sentence. All it established was that recovery may be reasonably equated with "`the entirety of a sum obtained by process and course of law which includes settlement.'" (Wakefield, supra, 145 Cal.App.4th at p. 981, 52 Cal. Rptr.3d 400, original italics omitted, new italics added.)[11] If anything, the quotation undermines the equation of "award" with "recovery" because no sum is "obtained" by the plaintiff in a net zero judgment. The plaintiff leaves the court empty handed. The "entirety" of zero is zero.
Rounding the corner from its third paragraph, the Wakefield court headed into the home stretch on its discussion of the statutory language, with a final, fourth paragraph. This final paragraph consists of three sentences, and no references to authority, or even any proposition established in the previous two paragraphs.
The first sentence equates the statutory word "recovery" with the nonstatutory concept of a comparison of damage claims. The sentence is: "Thus, we conclude, the party with the net monetary recovery is determined by comparing the competing damage claims on both sides of the litigation." (Wakefield, supra, 145 Cal. App.4th at p. 981, 52 Cal.Rptr.3d 400, italics added.) We cannot agree with this sentence. A comparison of damage claims is not necessarily determinative of a net recovery. Only as a comparison eventually translates into a positive judgment *287 does it meaningfully entail a "net recovery."
The second sentence of the fourth paragraph states a correct proposition, because it uses the word "obtains," which in context can indeed be a reasonable synonym for "recovery." The sentence is: "If both sides have claims, whichever party obtains the most money from the other prevails." (Wakefield, supra, 145 Cal.App.4th at p. 981, 52 Cal.Rptr.3d 400.) The phrase "obtains the most money" is perfectly consistent with looking at the judgment in a case, because it is only through a judgment (or order) that a party actually obtains money.
The final, third, sentence in the paragraph is a non sequitur, on at least two levels, implying (but not quite explicitly stating) something necessary to complete the majority's thesis. The sentence is: "If only one party has damage claims, any success in pressing those claims against the losing party results in a net award." (Wakefield, supra, 145 Cal.App.4th at p. 981, 52 Cal.Rptr.3d 400.)
On the first level, the statement does not logically follow because it equates the relatively vague concept of "any success" with a "net award." But the idea of "any success" is meaningless in the statutory context of section 1032, which uses the word "recovery." Indeed, as we have just established, the use of the phrase "the party" precludes amorphous moral victories, yet "any success" could easily be stretched to include such amorphous moral victories.
For example, would a plaintiff who was awarded nothing even prior to a judgment be able to claim to have been given a "net award" simply because he or she scored "some success" by prompting the trial judge to give a good scolding to the other side? No doubt there are litigants who live for the satisfaction of having the trial judge give the other side a good dressing down, and that is some "success." Which is a reason the Legislature wisely omitted the concept of "any success" from the words of the actual statute.
The second non sequitur is the implicationthough the Wakefield majority did not quite say it out loudthat "any success in pressing those claims" should be equated with the statutory words, "net monetary recovery." Again, that idea does not logically follow. As the facts in Wakefield and the case before us show, a party can have "success" in a kind of symbolic, moral victory sort of way and still have no recovery.
And with that, the Wakefield court ended its discussion of the current statutory language.

2. The Wakefield Majority's Analysis of the Predecessor Statute
The Wakefield majority then devoted three paragraphs on pages 981 and 982 to analyzing the implications of a change in the language of section 1032 that occurred in 1986 at the behest of the California Judges Association. The previous version used the gender-specific phrase, "plaintiff upon a judgment in his favor." The California Judges Association wanted the current phrase, "the party with a net monetary recovery."
The first of the three paragraphs simply introduces the 1986 change in statutory language. The second of the three paragraphs is devoted to making the point that the old language ("judgment in his favor") had been construed in Ferraro v. Southern Cal. Gas. Co. (1980) 102 Cal.App.3d 33, 52, 162 Cal.Rptr. 238 (Ferraro ), and in Syverson, supra, at p. 113, 214 Cal.Rptr. 581, to mean that "courts had no difficulty awarding costs to plaintiffs who won a verdict that was later offset by compensation from other parties." (Wakefield, supra, 145 *288 Cal.App.4th at p. 981, 52 Cal.Rptr.3d 400.) Most of the second paragraph is devoted to quoting from the Ferraro decision.
We will discuss Ferraro and Syverson in the context of analyzing the prior case law, which is the next section ahead of us. However, at this point, to be fair to the Wakefield majority, we should point out that its result was indeed supported by those two cases. It may be that, realizing that coming to any other result would mean disagreeing with Ferraro and Syverson and being reluctant to disagree with that precedent, the Wakefield simply bent over backwards (we think, beyond the breaking point) to incorrectly equate "award" or "verdict" with "net monetary recovery" when it analyzed the text of the statute.
The third paragraph consists of two sentences. The first sentence relies completely on the case law cited in the second paragraph. It is only here that the reader first encounters a recognition on the part of the Wakefield majority that awards or verdicts may not translate into judgments. The sentence is: "The current language of the statute, which employs the phrase `net monetary recovery' rather than the term 'judgment,' makes it even easier to distinguish between a jury verdict awarding net damages to a litigant (a net recovery) and the ultimate judgment, which necessarily comes later and may reflect offsets from other parties' contributions. (§ 1032, subd. (a)(4).)" (Wakefield, supra, 145 Cal. App.4th at p. 982, 52 Cal.Rptr.3d 400, italics added.)
We now face the same problem the Wakefield majority diddoes the change from the word "judgment" to the word "recovery" signal an intention on' the part of the Legislature to tell courts to look at "awards" or "verdicts" instead of judgments or, if one pleases, actual recoveries? The Wakefield majority assumed that the change made it "even easier"even easier than the Ferraro and Syverson courts had found itto look to prejudgment verdicts or awards as the test.[12] But that conclusion does not follow. The Wakefield majority missed an obvious difficulty that would be continuously inflicted on the trial courts by using the phrase, "judgment in hi? favor," that is completely solved by substituting the phrase "net monetary recovery." That problem is this: In complex injunction cases, how do you tell in whose "favor" a judgment has been rendered? The three other categories of section 1032 allow for a determination in an injunction case where the "relief is all one-sided. But those categories do not apply where the relief is mixed.
Sometimes in injunction casesunlike "net monetary" casesthere is no bright line. For example: Consider a litigant who claims a very wide easement through a neighbor's beautiful tulip garden, and regularly tramples the flowers growing on the claimed easement, and then sues to establish the right to keep on trampling. Indeed, let's assume that the litigant feels very personal about the easement, claiming it to have been given in return for a particular favor done the neighbor by the litigant's grandparents. And let's also suppose the trial judgelet's call her Portiaenters an injunction that recognizes the easement and states that the plaintiff may indeed pass through the garden.
*289 At that point the litigant no doubt thinks that the judge is a "Daniel come to judgment" (an old phrase for a good judge) and is the "prevailing party."
But suppose our hypothetical Portia then includes in the injunction a proviso that in the process of the use of the easement, the plaintiff my not trample on a single existing flower.
In whose "favor" was this hypothetical judgment really entered? By changing the phrase from "judgment in his favor" to "net monetary recovery" it is clear that at the very least the Legislature spared trial judges such Shakespearean conundrums.
Thus, by substituting the phrase "net monetary recovery" for "judgment in his favor," the Legislature elegantly relieved trial judges from the troublesome task of figuring out in whose "favor" a mixed injunction case might have been decided.
Moreover, it is illogical to conclude that the change in the language from "judgment" to "recovery" meant that the test was now to be "award" or "verdict." Award or verdict do not necessarily import any actual transfer of wealth from one party to another. The Legislature did not use them. It used a word that does connote an actual transfer of wealth.
Nor did the Wakefield majority cite any legislative history showing a legislative intent to adopt the interpretations advanced by the Ferraro and Syverson courts. In fact, Justice Mihara's dissent delved more into the subject. (See Wakefield, supra, 145 Cal.App.4th at pp. 994-996, 52 Cal. Rptr.3d 400 (dis. opn. of Mihara, J.).)
The Wakefield majority did cite Acosta. v. SI Corp. (2005) 129 Cal.App.4th 1370, 1375, 29 Cal.Rptr.3d 306 (Acosta), and Pirkig v. Dennis (1989) 215 Cal.App.3d 1560, 1565-1566, 264 Cal.Rptr. 494 (Pirkig), for the proposition that there was nothing in the history of the statute to suggest an intent "to constrict the class of prevailing parties." (Wakefield, supra, 145 Cal.App.4th at p. 981, 52 Cal.Rptr.3d 400.)
At most, the citations to Acosta and Pirkig might be taken as an inference that the Legislature was indifferent to the effect that substituting "recovery" for "judgment" would most certainly spare trial judges the problem of figuring out in whose "favor" an injunction had been issued. On examination, though, neither Acosta, nor Pirkig, however, supports even such an attenuated inference.
Acosta noted that the 1986 change was sponsored by the California Judges Association and quoted language from Witkin (not the Legislature) that under the new statute, the "`fundamental principle of awarding costs to the prevailing party remains the same.'" (Acosta, supra, 129 Cal. App.4th at p. 1375, 29 Cal.Rptr.3d 306, original italics.) But the quote also included these words: "`but whether those costs are awarded as a matter of right or as a matter of the court's discretion now often depends on how the prevailing party is determined.'" (Id. at p. 1375, 29 Cal. Rptr.3d 306, italics added.) The quotation from Acosta, if anything, supports an inference that the Legislature wanted to make it easier on judges to tell who fell into one of the mandatory categories of section 1032an inference consistent with the idea that the change from "judgment" to "recovery" was intended to at least spare trial judges the problem of mixed result injunction cases.
The citation to Pirkig, likewise, does not support the idea that the Legislature wanted to codify either the Ferraro or Syverson cases. There is nothing on the two pages of Pirkig cited by the Wakefield majority that addresses legislative history. On the other hand, Justice Mihara trenchantly noted that the better inference is *290 that the Legislature actually chose to reject Ferraro or Syverson by substituting the word "recovery" for "judgment." After all, the plaintiffs in Ferraro and Syverson were "`not entitled to recover'" anything as a result of their zero judgments, yet the Ferraro and Syverson courts still deemed them prevailing parties. (Wakefield, supra, 145 Cal.App.4th at p. 995, 52 Cal.Rptr.3d 400 (dis. opn. of Mihara, J.).)
The Wakefield majority ended its discussion of the 1986 change with a final sentence that added no new substantive ideas, but merely reiterated the majority's conclusion. The sentence is: "To summarize, as used in section 1032, subdivision (a)(4), `net monetary recovery' is determined after netting out any competing damage claims as between plaintiff and defendant, without regard to settlements or other contributions from unrelated defendants or from other parties." (Wakefield, supra, 145 Cal.App.4th at p. 982, 52 Cal.Rptr.3d 400.)

3. The Wakefield Majority's Analysis of Case Authority

a. The Actual Analysis

At pages 982 and 983 of the official reporter, the Wakefield majority devotes three paragraphs to prior case law: The first paragraph was a thesis statement, asserting that the court's handling of the statutory language had been "borne out by cases decided before and after section 1032 was rewritten in 1986," for which it cited a statement in Zamora v. Shell Oil Co. (1997) 55 Cal.App.4th 204, 215, 63 Cal. Rptr.2d 762 (Zamora), that cases decided before still 1986 had "`precedential effect.' " In the second paragraph, the Wakefield majority cite five cases as emphasizing that settlement offsets "`do not affect a prevailing party determination,'" and then illustrated that proposition with a sentence from Zamora, again making the same point in context of the facts of that case. Finally, third paragraph comes full circle, noting that statements cited (from Zamora) "necessarily follow from" the Wakefield's majority's interpretation of the words, "net monetary recovery." The paragraph ends with a rule that simply restates the conclusion that a "damage award for one litigant" means a "net monetary recovery for purposes of the prevailing party determination under section 1032, even if the judgment is later reduced to zero as a result of offsets for good faith settlement under section 877." (Wakefield, supra, 145 Cal.App.4th at pp. 982-983, 52 Cal.Rptr.3d 400.)
Significantly, the Wakefield majority added a footnote in its summary third paragraph in which it confronted the dichotomy between awards and judgments, noting that one of the cases cited, Pirkig, supra, 215 Cal.App.3d 1560, 1566, 264 Cal. Rptr. 494, "appears to conflate the concepts of net monetary recovery and net judgment." (Wakefield, supra, 145 Cal. App.4th at p. 982, fn. 5, 52 Cal.Rptr.3d 400.) The majority stated, without specifically addressing the issue at that point, that it simply "disagree[d] with" the Pirkig court's "conclusion." (Id. at pp. 982-983, fn. 5, 52 Cal.Rptr.3d 400.) It is that simple statement of disagreement without explanation that constitutes the ipse dixit that we mentioned above.
The five cases (more accurately, point cites) mentioned in the Wakefield opinion as emphasizing the proposition that offsets do not affect prevailing party determinations are: Great Western Bank v. Converse Consultants (1997) 58 Cal.App.4th 609, 613, 68 Cal.Rptr.2d 224 (Great Western); Zamora, supra, 55 Cal.App.4th at pp. 213-215, 63 Cal.Rptr.2d 762; Pirkig, supra, 215 Cal.App.3d at pp. 1565-1568, 264 Cal.Rptr. 494; Syverson, supra, 171 Cal.App.3d at 112-114, 214 Cal.Rptr. 581 *291 and Ferraro, supra, 102 Cal.App.3d at pp. 52-53, 162 Cal.Rptr. 238. On examination, it turns out that the idea stems from the seminal case, Ferraro. That case, however, was decided incorrectly.

b. It All Traces Back to Ferraro

i. What happened in Ferraro

So let's examine Ferraro. If everything had gone normally in Ferraro, the plaintiff would have obtained a positive judgment even after application of section 877, and the appellate court would never have had the occasion to address the interaction between section 1032then using the phrase "judgment in his favor"and section 877. The key facts in that regard are that the plaintiff sued three defendants, two of those defendants paid only $35,000 in settlements, and the jury returned a verdict of slightly more than $91,000. Yet the trial court entered a zero judgment.
What happened? The facts going into trial were pretty straightforward. An electric company hired a construction company to lay a new electric line, and a backhoe operator of the construction company accidentally pulled loose a gas service connection, resulting in an explosion that destroyed three beach rental units.
Once the case got into trial, however, it contorted itself into a difficult little knot what the Ferraro court itself called an "unusual posture." (Ferraro, supra, 102 Cal.App.3d at p. 47, 162 Cal.Rptr. 238.)
The difficulties began when the owners of the three rental properties obtained $70,000 from a first-party insurer and gave the insurer a subrogation agreement. The insurer then filed a complaint against the construction company, the electric company, and the gas company. About six months later the owners filed their own complaint against those three entities as well, but did not join the insurer in their action. After obtaining a settlement of $35,000 from the electric company and the construction company, the case went to trial against the remaining defendant, the gas company.
The $70,000 insurance payment had created an "unusual posture" because of the potential that the defendant might have to pay twice for the same $70,000 already recovered from the insurer. At the same time, the collateral source rule would have required that the $70,000 insurance settlement simply be ignored. (See Ferraro, supra, 102 Cal.App.3d at pp. 45-8, 162 Cal.Rptr. 238.) The point of the collateral source rule is that tortfeasors should obtain no benefit from a tort victims purchase of insurance. (See id. at pp. 45-46, 162 Cal.Rptr. 238 [discussing collateral source rule.) Things became even more complicated because the owners actually alleged in their own complaint that they had received $70,000 in benefits from their insurer, so it became easy for the trial court to reject application of the collateral source rule when the plaintiffs themselves put "the fact of their insurance recovery in their complaint." (Id. at p. 39, 162 Cal. Rptr. 238.)
The defendant's attorney then violated the collateral source rule, perhaps blatantly. In his closing arguments, the attorney for the gas company, as the sole remaining defendant, told the jury they should take into account the $70,000 paid by the plaintiffs' insurer. That statement was followed by an objection and an in-chambers conference. The trial court eventually settled on a course of (1) telling the jury that it should not take into account the $70,000 in arriving at a verdict against the gas company, but (2) the court would deduct $65,500 (the difference being the "costs" incurred to obtain the $70,000 insurance payment) from any verdict. The jury returned a verdict of about $91,000, but the trial court, offsetting the verdict against *292 both the $35,000 prior payments and the $65,500 net insurance recovery, entered an "ultimate judgment" of zero. (Ferraro, supra, 102 Cal.App.3d at pp. 39-0, 162 Cal.Rptr. 238.) However, the trial court decided to award costs to the plaintiff owners.
Most of the Ferraro opinion is taken up in explaining, as against the plaintiff owners' appeal, why the trial court did not err in offsetting the insurance proceeds against the verdict. Essentially, it came down to saying that the rule against double liabilitynote, double "liability," not double "recovery"must "predominate" over the collateral source rule. (Ferraro, supra, 102 Cal.App.3d at p. 47, 162 Cal. Rptr. 238.) On that score we need not comment.[13]
The issue of the interaction with section 877, however, came up in the context of the gas company's cross-appeal from the cost award to the plaintiffs. On that topic the Ferraro court devoted two paragraphs: the first to delineate the issue in the context of a previous case, Gerstein v. Smirl (1945) 70 Cal.App.2d 238, 160 P.2d 585 (Gerstein); the second to use Gerstein as authority to reject the gas company's contention that costs should not have been awarded to the owners.
Gerstein was a two-party auto accident case in which the defendant filed a cross complaint and the jury determined that both parties were at fault and awarded nothing to either party. The judgment, though, awarded costs to the original defendant. The "sole question" the appellate court faced was whether a "defendant who is awarded nothing on his cross-complaint" entitled "to recover costs of suit from an unsuccessful plaintiff." (Gerstein, supra, 70 Cal.App.2d at p. 239, 160 P.2d 585.) That was an issue of first impression. The Gerstein court noted the anomaly that if the defendant had never bothered to file a cross-complaint in the first place, there would have been no question that she could have recovered her costs. In affirming the cost order, the court used the phrase "make out his case." But the passage in which the phrase was used was concerned with showing that "if plaintiff in an action fails to make out his case, the defendant is entitled to judgment and must be regarded as the prevailing party." (Id. at pp. 240-241, 160 P.2d 585, italics added.) The Gerstein court did not let the reader lose sight of the fact that it was the judgment that was the reason for affirming the cost award in favor of the defendant: "In an action such as the instant one for damages, the `net result' of a judgment requiring defendant to pay nothing to the plaintiff is favorable to the former." (Ibid., italics added.)
Back to Ferraro: In the second and final paragraph on the issue, the Ferraro court used the "fails to make his case" language from Gerstein as its foil to affirm the cost award to the plaintiff owners, essentially saying that their jury verdict was enough, because they had "made their case."

ii. An analysis of the critical language in Ferraro

Here is ground zero, that is, the critical passage from Ferraro, which follows closely *293 on the quotation from Gerstein in which the make-his-case language appears. We quote it in its entirety in the text because it is this passage that would subsequently lead several courts astray, including Syverson and the Wakefield majority: "Here appellants [the owners suing the gas company] did not `fail to make out their case,' as in Gerstein. To consider appellants as not having received a `favorable judgment' would exalt form over substance. They certainly were the prevailing party in the lawsuit and the fact that the Gas Company did not have to actually pay them any damages was due not to any deficiency in their case, but due to circumstances not directly stemming from the issues regarding liability as litigated between the parties. Disallowance of an award of costs to appellants under these circumstances could only be based upon a hypertechnical construction of the words of section 1032, Code of Civil Procedure, unsupported by case law." (Ferraro, supra, 102 Cal. App.3d at pp. 52-53, 162 Cal.Rptr. 238, italics added.)
This passage falls apart upon sentence-by-sentence scrutiny.
The first sentence assumes that the Gerstein standard was whether plaintiffs "fail to make out their case," but does not otherwise provide any support for the idea that "make-your-case" is the statutory standard. The implication is doubly unsupported because, in context, the Gerstein case was using the expression "make out his case" to refer to the fact that the plaintiff had obtained a zero judgment, not that the plaintiff had obtained a positive award reduced to a zero judgment. One of the major planks of the Gerstein decision was: "It is well settled that, where both plaintiff and cross-complainant recover money judgments, a defendant to whom the `net result of the judgment' is favorable is entitled to recover all his costs. [Citations.]" (Gerstein, supra, 70 Cal.App.2d at p. 240, 160 P.2d 585, italics added.)
The second sentence uses a classic judicial negative image (exalting form over substance) to, once again, imply something without logically supporting that something: How, precisely, does receiving a zero judgmentfor which, ironically, the Ferraro court itself was responsible at least insofar as it affirmed the trial court's decision not to follow the collateral source ruleequate to having "received a `favorable judgment'"? At the very least the anomaly of a zero judgment being treated as a favorable one should have been explained, but the sentence gives no hint of resolving the anomaly.
The explanation comes in the third sentence, which impliedly repeats the assumption of a "make-your-case" standard by referring to the absence of "any deficiency in their case," and which, interestingly enough, alludes (but does not explain) to the fact that the litigation had been allowed to become a procedural hash. The allusion to "circumstances not directly stemming from the issues regarding liability as litigated between the parties" appears to be a recognition by the Ferraro court that, if things had been done as they should have been done, the issue would not have arisen at all.
Consider this hypothetical: The plaintiffs in Ferraro sued three defendants, received only $35,000 in settlements against two of them, then went to trial against the remaining third and received a $91,000 award. In the normal course of events they would have received a positive judgment of about $56,000, and there would have been no question that that positive "judgment" was a "favorable" one. The words of the pre-1986 statute would have been respected by awarding costs to those plaintiffs. (To be sure, the plaintiffs might have had to turn their $56,000 recovery *294 over to their insurer later.) It was only the refusal to follow the collateral source rule that created the "circumstances not directly stemming from the issues regarding liability as litigated between the parties."
The final, fourth sentence invoked another judicial horriblethe "hypertechnical construction" of the words in section 1032 to imply that the court had no choice but to affirm the cost award in favor of parties who obtained only a zero judgment. The Ferraro court did not explain how ignoring the actual words "judgment in his favor" and inserting in their stead some,' variation on the theme of "positive verdict" was "hypertechnical."
It appears the Ferraro court simply forgot section 1858, with its requirement that judges are not to "insert what has been omitted." In any event, as "we will now show, respecting the difference between the phrase in effect at the time, "judgment in his favor," and the phase, "positive verdict even if there is a zero judgment," is not, in substance, hypertechnical.

iii. The "hypertechnical" point
We now turn to the main plank of the Ferraro decision, which is an apparent impatience with the' word "judgment" in the "wording" of section 1032 as it then read, as in "judgment in his favor." Is the distinction between "verdict" or "award" on the one hand, and the "judgment" on the other, really to be discarded as "hypertechnical?"
No. In the context of the operation of section 877, not respecting the difference between these words obliterates a key policy concern set out by the Legislature in section 877the encouragement of settlement. (See Tech-Bilt, Inc., v. Woodward-Clyde & Associates (1985) 38 Cal.3d 488, 493, 213 Cal.Rptr. 256, 698 P.2d 159 [one of the two great policy goals of section 877 is to encourage settlement].)
If the difference in the words is respected, section 877 will operate to create a powerful incentive to settle on the part of plaintiffs who have already collected an amount in prior settlements that approaches the theoretical maximum amount of their "claim." The more the plaintiff has already collected, the less likely that the plaintiff will actually recover anything, because the threshold required for a positive judgment keeps going up.
In a case like the present one, if the plaintiff elects to gamble in face of settlements that already may approach (or even exceed) the likely award or verdict, the plaintiff faces the possibility of not being the prevailing party, and being forced to pay costs and maybe even attorney fees. Under such circumstances, the incentive is to accept smaller amounts offered in settlement from the remaining defendant (or defendants) and spare the court the need for a trial. And from the defendants' point of view, the incentive to settle is created by the prospect of being sued for contribution by their fellow tortfeasors and obligors. The statute nicely dovetails with the good faith settlement statute to give defendants an incentive to make "ball park" settlements in good faith so as to prevent the prospect of being sued by remaining defendants who refuse to settle and throw their own dice gambling for a low "award." (§ 877.6.)
On the other hand, dismissing the difference between the concepts of "verdict" and "award" on the one hand, and "judgment" and "recovery" on the other, affirmatively thwarts the legislative policy in favor of settlement. Able plaintiffs' counsel, for example, are likely to have already "sunk" considerable amounts of time and preparation into a case by the time they have collected substantial amounts in settlements *295 and face one (or a few) remaining nonsettling defendants. Without the operation of section 1032that is, without actually following the words of section 1032, "judgment" or "recovery,"able counsel have very little reason not to roll the dice and take the case to trial against the remaining defendant or defendants. Under the Wakefield rule, even a token verdict or award would entitle the party to prevailing party status even if that token verdict or award was completely obliterated by section 877s application of prior settlements.
The difference between a "verdict," (or "award") and an ultimate "judgment," then, is a powerful incentive promoting the legislative goal of settlement. It was inaccurate of the Ferraro court to dismiss that difference as "hypertechnical."

c. The Other Cases Relied On by Wakefield

The Wakefield majority invoked four other cases for the rule that "`corresponding offsets do not affect a prevailing party determination.'" We take each case in chronological order.

i. Syverson

Syverson was decided under the pre-1986 "judgment in his favor language" and did, indeed, rule that a plaintiff in an auto accident case whose judgment was ultimately offset to zero because of prior settlements by other defendants (albeit the reduction to a zero judgment took place on appeal)[14] was indeed within the "judgment in his favor" language. On that point, the court quoted the "hypertechnical" passage from Ferraro, stated that it found the "reasoning in Ferraro persuasive" and then added these new comments: "Defendant reasons he is the prevailing party because the zero net judgment demonstrates plaintiff did not have a cause of action for negligence at the time trial commenced as actual damages are an essential element of a cause of action for negligence. This faulty reasoning omits a critical factor. At time of trial, damages had yet to be assessed. The complete offset of an award by the amount of a settlement cannot be used to bootstrap a claim that plaintiff had no legitimate cause of action at the beginning. Plaintiff had a legitimate cause of action and he prevailed on it. The jury found defendant liable for plaintiffs injuries. The fact that plaintiff is not entitled to recover damages from defendant is due not to a failure to `make out his case,' but solely to the fortuitous fact that the damages assessed by the jury equaled the sums previously received in settlement." (Syverson, supra, 171 Cal. App.3d at p. 113, 214 Cal.Rptr. 581, italics added.)
The passage must be analyzed in two parts: The first part attempts to rebut an argument made by the defendant having received a net zero judgment. The second part attempts to establish substantively that the plaintiff was the true winner, despite the zero judgment.
The first (rebuttal) part is merely the easy demolition of a bad argument made by the losing litigant. Based on the Syverson court's characterization of the defendant's *296 argument, the defendant was buying in to the idea that a "favorable judgment" was determined by the presence of viable cause of action going into the trial. ("[P]laintiff did not have a cause of action for negligence at the time trial commenced as actual damages are an essential element of a cause of action for negligence.") And of course that argument was indeed "faulty reasoning," because if the test is whether a plaintiff has a viable cause of action at the time trial commences, then it makes no difference how section 877 operates after the trial.
We would simply add that "viable cause of action" going into trial is not a concept found in the words used by the Legislature. Such a test is also fundamentally incompatible with section 877, which already assumes a degree of viability to the "claims" which are reduced by prior settlements.[15] The test at the time of Syverson was whether the plaintiff had a "judgment in his favor," not whether he had a "cause of action" going into the trial.
As to the second part, as the italicized words show, the Syverson court equated having a "legitimate cause of action," with substantive "liability," and the making of one's "case" as the tests for "judgment in his favor." Once again, we must disagree with the appellate rewriting of words chosen by the Legislature. The legitimacy of a cause of action, or a prejudgment finding of liability, or the subjective "making" of a case did not fit the statutory test at the time"judgment in his favor." To be sure, these tests might very well be appropriate in discretionary contexts for prevailing party determination. Indeed, we examine such an instance when we discuss Pirkig below. But these tests cannot reasonably be equated with judgments in parties' favor.

ii. Pirkig

Following Syverson came Pirkig, which was the first case to come after the 1986 change from "judgment in his favor" to "net monetary recovery." Any support in Pirkig for the idea that a zero judgment can be equated with a net monetary recovery is strictly dicta, because the appellate court simply affirmed the trial court's exercise of its discretion, in a case where a judgment was reduced to zero, to declare the plaintiff the prevailing party. The court emphasized that the "net monetary recovery" category was "far from being the sole instance when a litigant may be declared the prevailing party in a case." (Pirkig, supra, 215 Cal.App.3d at p. 1565, 264 Cal.Rptr. 494.) The court upheld the cost award because the plaintiff "clearly" fell "within the latter defined categories" of section 1032, and in that context ruled that the adjudication of substantive liability was enough to support the trial court's discretion. (See id. at p. 1566, 264 Cal. Rptr. 494.)
To be sure, the Pirkig court buttressed its affirmance of the trial court's discretion with two paragraphs discussing the Ferraro and Syverson cases, including quoting the "make their case" language from Ferraro, and the "fortuitous" language from Syverson. (See Pirkig, supra, 215 Cal. App.3d at pp. 1566-1567, 264 Cal.Rptr. 494.) The point of those paragraphs appears (from the preceding paragraph, see id. at p. 1566, 264 Cal.Rptr. 494) to have been that the trial court was surely within its discretion to declare the plaintiff to have prevailed. The discussion ended by noting that Ferraro and Syverson had "precedential force even after the amendment of section 1032" (id. at p. 1568, 264 *297 Cal.Rptr. 494), and it was that proposition that the Wakefield majority relied on in its own use of the Ferraro and Syverson. (See Wakefield, supra, 145 Cal.App.4th at p. 982, 52 Cal.Rptr.3d 400.)
Nothing in this opinion we write now is intended to suggest that Pirkig was incorrectly decided. The language quoted by Pirkig from Ferraro and Syverson provides valuable judicial insight into ideas that would support the exercise of a trial court's discretion to declare a zero judgment plaintiff to have prevailed. Indeed, had the trial court here exercised its discretion in the case before us to have declared plaintiffs Goodman and Guinther to have prevailed, the opinion we write now might very well be following Pirkig and adopting those ideas from Ferraro and Syverson. But we will not re-write section 1032, either its pre-1986 version or its post-1986 version, to insert into it ideas which the Legislature never put there.

iii. Zamora

Zamora, supra, 55 Cal.App.4th 204, 63 Cal.Rptr.2d 762, was the first case, proper after the 1986 change to rule that a zero judgment still allowed a party to claim to be "the party with the net monetary recovery." (Actually, in Zamora, it was judgmentspluralsince the plaintiffs included a group of 34 homeowners.)
After simply quoting the text of section 1032, subdivision (a)(4) and setting up the issue to be resolved (Zamora, supra 55 Cal.App.4th at pp. 213-214, 63 Cal.Rptr.2d 762), the court discussed the most recent case, Pirkig, and quoted its quotation of the "coincidence" passage from Syverson. Zamora next cited Pirkig for the proposition that the Ferraro and Syverson still had precedential effect. Then the court simply noted that had it not been for prior settlements, positive judgments "would have been entered" in favor of the plaintiffs, and declared, "[u]nder these circumstances" the defendant could not "proclaim itself to be the section 1032 prevailing party" and the trial court "correctly found" that the plaintiffs were "entitled to their costs." (Zamora, supra, 55 Cal.App.4th at p. 215, 63 Cal.Rptr.2d 762.)
It is clear that the Zamora court thought that the issue was settled by the Ferraro and Syverson cases, and there was no need to elaborate further. The Zamora court never considered whether Ferraro or Syverson had been faithful to the statutory language.

iv. Great Western

Which brings us to the last of the cases on which the Wakefield, majority relied, Great Western, supra, 58 Cal.App.4th 609, 68 Cal.Rptr.2d 224. The language from Great Western quoted by the Wakefield majority was one sentence (citing Zamora, Pirkig and Syverson). And the sentence was dicta, because the case did not have to do with the operation of section 877 upon prevailing party determinations.
In Great Western, a soils engineering company was sued on a cross-complaint by the successor to a developer (the bank) which in turn had been sued by groups of homeowners. Not being able to extricate itself from the case by settling with the developer's successor, the soils engineering company settled with the homeowner plaintiffs directly for $300,000, and obtained a declaration of good faith settlement as against the objection of the developer's successor. The soils company then successfully sought costs as prevailing party against the developer's successor. (Trial on the cross-complaints was severed.) The developer's successor then appealed, asserting that it was the prevailing party on the cross-complaint filed by the developer's successor. (See Great Western, supra, 58 Cal.App.4th at pp. 611-612, 68 *298 Cal.Rptr.2d 224.) Because the cross-defendant came within one of the other mandatory categories of section 1032a defendant in whose favor a dismissal is entered, which also applies to cross-defendants the court had no occasion to ponder any distinction between awards, verdicts, and, on the other hand, judgments. In context, the point of the offset language quoted by the Wakefield majority was this: Just because the amount of money paid by the soils engineering company was an "offset against the judgment" against the developer's successor, did not mean that the developer's successor "obtained a `net monetary recovery' from" the soils engineering company. (Great Western, supra, 58 Cal. App.4th at p. 615, 68 Cal.Rptr.2d 224.) The absence of a "net monetary recovery" by the developer's successor was obvious from the facts.

4. The Balance of the Wakefield Majority Decision

We have noted that, after the crescendo of declaring the plaintiff to be "entitled" to prevailing party status, the balance of the Wakefield majority decision was a relatively predictable coda. The husband of the husband-wife team that sold the defective house couldn't claim prevailing party status because he "lost at trial" to the plaintiff-buyer. The wife could not claim prevailing party status as a matter of right, even though the jury actually entered verdicts in her favor because of her "unity of interest" with her husband. (Wakefield, supra, 145 Cal.App.4th at pp. 983-985, 52 Cal.Rptr.3d 400.) However, the wife might have been able to recover costs under the discretionary provisions of section 1032, but the trial court apparently did not understand the nature and extent of its discretion, so the case had to be returned for that exercise, albeit any award to her was "subject to apportionment" in relation to her husband, and the court was not to award her attorney fees. (See id. at pp. 985-990, 52 Cal.Rptr.3d 400.)
What is significant in the post-climactic passages of the Wakefield majority, though, is the nature of the language the court used to describe the result in the case: As if the court forgot that there was a zero judgment, the plaintiff was described as having "recovered" against the husband. (Wakefield, supra, 145 Cal. App.4th at pp. 983-984, 52 Cal.Rptr.3d 400.) Likewise the husband was described as having "lost at trial" (id. at p. 983, 52 Cal.Rptr.3d 400) even though the judgment had provided that he didn't have to pay a thing.
We cannot agree. The plaintiff in Wakefield actually "recovered" nothing from either defendant. At most there was the mere moral victory of a jury verdict, later rendered nugatory when section 877 operated to serve up zero actual recovery.

D. A Fresh Look at The Statutes

The phrases "make one's case," "any success," and "absence of any deficiency in. one's case" are all valuable ideas, if just a little bit amorphous, and surely bear on the question of when the trial court might exercise its discretion to declare a zero judgment plaintiff to be the prevailing party (as indeed happened in Pirkig). But these ideas simply do not amount to equivalents for the statutory language used by the Legislature for the first category of mandatory prevailing parties: judgment in his favor prior to 1986 and net monetary recovery after 1986.
But something else requires mentioning: Particularly in the context of the interaction between sections 877 and 1032, it makes no sense to depart from the words the Legislature used and substitute concepts *299 better suited for tests of general discretion.
The operative word in section 877 is claims, as in "shall reduce the claims against the others." Section 877 thus operates going in to the trial against remaining defendants. If section 877 operated after the judgment, say, by application of entitlement to a satisfaction of judgment, then a litigant could indeed claim to have a "judgment in his favor," or perhaps even a "net monetary recovery" even though section 877 would later take away what the judgment gave. But that is not the way it works, and, ironically, it was the Syverson opinionthat is, the first part of the Syverson opinion dealing with the offset required by section 877, not the later part dealing with who was the prevailing partythat establishes that point. Any reduction for prior settlements is made prior to entry of judgment, so the question of whether there was a judgment in a litigant's favor is tested after the operation of section 877 results in that judgment, not before.
If we flip the analysis around and look at it the other way, it makes no sense to say that a litigant with a zero judgment obtains a "favorable judgment" or "net monetary recovery." One should ask oneself: At what precise point in time would a zero judgment plaintiff have such a "favor judgment" or "net monetary recovery." Answer: It would be a neutrino-like phenomenon, with an almost imperceptible half life. It would exist only as long as it would take the trial judge to prepare the judgment after the jury rendered it verdict or the trial judge calculated the award, and then learned of the amount of prior settlements. If the paperwork were ready to go, the existence of anything even rhetorically favorable to the plaintiff might literally be measured in mere seconds. The Legislature obviously didn't mean that, and the words the Legislature chose do not reflect any such intention.

V. CONCLUSION
In light of the foregoing, we hold that when litigation results in a net zero judgment as a result of the operation of section 877, the plaintiff receiving the net zero judgment does not fall into the category of "the party with the net monetary judgment" set out in section 1032. Thus, contrary to Wakefield (and Zamora), the trial judge was not compelled to declare plaintiffs Goodman and Guinther as the prevailing parties because they had a "net monetary recovery" here. Goodman and Guinther didn't recover anything in this litigation, and the trial court correctly recognized that fact. And there is no dispute that under the circumstances of this case, the trial court's exercise of discretion to declare the Lozanos the prevailing parties was a reasonable one, and therefore must be upheld under an abuse of discretion standard.
We realize, however, that our conclusions in this opinion will make work for our Supreme Court, if not in this case, then some other time, since we can't exactly claim that our analysisbasically just following the words of the statute and pointing out that they make sense if given their plain meaninghas led to a "uniformity of decision" in California's case law. In any petition for review, Goodman and Guinther will be able to truthfully assert that our decision to affirm the trial court's award is not consistent with the Wakefield majority opinion, or the result in Zamora, and also is at odds with the results in Ferraro and Syverson under an earlier version of the statute.
But, as our Supreme Court reiterated only very recently in Doe v. City of Los Angeles (2007) 42 Cal.4th 531, 545, 67 Cal. Rptr.3d 330, 169 P.3d 559: "[I]n construing *300 this, or any statute, we may not broaden or narrow, the scope of the provision by reading into it language that does not appear in it or reading out of it language that does." Or, as the court said about a decade ago, "a court ... may not rewrite the statute to conform to an assumed intention which does not appear from its language." (In re Hoddinott (1996) 12 Cal.4th 992, 1002, 50 Cal.Rptr.2d 706, 911 P.2d 1381, internal quotation marks omitted.)[16]
This issue is not one where a court must delve into the interstices of language in order to interpret that language in a way that is not unconstitutional, or where the language is ambiguous and courts must do their best to fathom the purpose of the legislature in the face of that ambiguity, or where a literal application of the words leads to patently absurd results. Literal application of the plain language of this statute actually promotes the legislative goal of encouraging settlement.
We regret that we must depart from prior appellate case law, but faithfulness to the statute permits no other course. The judgment in G036774 reflecting the proper application of section 877 to partners is affirmed. The order in G037091 reflecting the proper exercise of trial court discretion on the prevailing party issue is also likewise affirmed.
Respondents shall recover their costs in this appeal.
WE CONCUR: SILLS, P.J., and RYLAARSDAM, J.
NOTES
[1] All further undesignated statutory references are to the Code of Civil Procedure.
[2] The idea is that the trier of fact should not be influenced in its deliberation on the amount of the award (or verdict) by the amount of prior settlements. (See Syverson v. Heitmann (1985) 171 Cal.App.3d 106, 111, 214 Cal.Rptr. 581 (Syverson) [noting that some cases have disapproved of bringing prior settlements to the attention of the jury when there is no dispute about them].)
[3] The trial judge justified the amount of the fee award by pointing to "(1) relatively modest hourly rates, (2) the rare ability to accomplish something in just one-tenth of an hour (and to bill accordingly), and (3) an unusually low amount of intramural conferencing and cross-pollination."
[4] Corporations Code section 16306, subdivision (b) provides that "A person admitted as a partner into an existing partnership is not personally liable for any partnership obligation incurred before the person's admission as a partner." Subdivision (c) introduces special rules for limited liability partnerships.
[5] Section 1032 provides in its entirety:

"(a) As used in this section, unless the context clearly requires otherwise:
"(1) `Complaint' includes a cross-complaint.
"(2) `Defendant' includes a cross-defendant or a person against whom a complaint is filed.
"(3) `Plaintiff includes a cross-complainant or a party who files a complaint in intervention.
"(4) `Prevailing party' includes the party with a net monetary recovery, a defendant in whose favor a dismissal is entered, a defendant where neither plaintiff nor defendant obtains any relief, and a defendant as against those plaintiffs who do not recover any relief against that defendant. When any party recovers other than monetary relief and in situations other than as specified, the `prevailing party' shall be as determined by the court, and under those circumstances, the court, in its discretion, may allow costs or not and, if allowed may apportion costs between the parties on the same or adverse sides pursuant to rules adopted under Section 1034.
"(b) Except as otherwise expressly provided by statute, a prevailing party is entitled as a matter of right to recover costs in any action or proceeding.
"(c) Nothing in this section shall prohibit parties from stipulating to alternative procedures for awarding costs in the litigation pursuant to rules adopted under Section 1034."
[6] Section 1034 provides the rules as to what is, and is not, allowable as costs under Section 1032.
[7] Michell is a perfect example of how the phrase "the party with a net monetary recovery" in section 1032 should work, though the underlying facts in the case are hardly a credit to the legal profession.

Two attorneys who once had a relationship where one would refer cases to another developed bad blood when one decided he had to sue the other for her own malpractice on a case she referred to him under a fee splitting agreement. The referring attorney retaliated by cross-complaining against the other for breach of the fee splitting contract and his own legal malpractice, and the other attorney in turn filed his own cross-complaint. Then things got really nasty when the referring attorney filed a second cross-complaint for assault and battery based on a push and shove incident at a candy bar vending machine. Trial was held on the referring attorney's cross-complaint; the other attorney dismissed his own cross-complaint on or before the first day of trial. On the claim for malpractice, the jury awarded the referring attorney $63,000, though she recovered nothing on her other claims. The trial judge, however, thinking that the "predominant issue" in the whole case was the push and shove incident at the vending machine, exercised his discretion to declare that each side must bear its own costssort of pox on both your houses approach no doubt engendered by the facts.
That decision was error, of course. The referring attorney clearly had the net monetary recovery and was therefore entitled to her costs as a matter of right. (Michell, supra, 49 Cal.App.4th at p. 1198, 57 Cal.Rptr.2d 227, which is the portion of the opinion cited by the Wakefield majority.) And while the Michell court did not say anything about a judgment in favor of the referring attorney as distinct from the jury "award" of $63,000it didn't have to. It was a case where (unlike here and in Wakefield) there was no dichotomy between the award and the judgment.
[8] Biren arose out of the competing claims engendered when one of the five physicians on the board of directors of an emergency care business decided to unilaterally terminate the emergency care firm's billing company, but the new billing company performed poorly, leading the other four directors to attempt to buy her out, which in turn led to valuation disputes, plus claims that the doctor was responsible for the bad performance of the new billing firm. On top of that, the doctor had failed to make certain pension contributions. The firm obtained a judgment which required the doctor to make about a $12,000 contribution to the firm's pension plan, but that judgment specifically stated it was to be "`applied as a credit'" as against some $47,000 that the firm owed the doctor for her shares in the firm. Given that the doctor had a "net recovery of more than $35,000" the firm could hardly claim prevailing party status. (Biren, supra, 102 Cal. App.4th at p. 139, 125 Cal.Rptr.2d 325.)
[9] Hansen was, as the Wakefield majority accurately noted, another classic case of netting damage claims. There, the claims of contractors for unpaid work and extras were offset for by claims for defective workmanship. But there's nothing in the case that suggests that prior settlements might not also offset awards. (Section 877 was about two decades in the future when the court handed down its decision.)
[10] California Style Manual (4th ed.2000) § 1.4, p. 10.
[11] The exact quotation was: "`The words "recovery" or "recovered" have the common connotation of representing the entirety of a sum obtained by process and course of law which includes settlement....'" (Wakefield, supra, 145 Cal.App.4th at p. 981, 52 Cal. Rptr.3d 400, original italics.)
[12] We note though: As we show below when we dissect Ferraro, that court did not attempt to square its result with the actual language of the statute, choosing to disregard that language as "hypertechnical." The Wakefield majority court missed the irony that Ferraro hadn't found it easy at all to base its result on the language of the statute, choosing, instead, to dismiss that language with the deus ex machina (fancy words for "cheap plot device") of calling it "hypertechnical."
[13] Except to say that the court's override of the collateral source rule doesn't seem immediately intuitive. What's the difference between the facts in Ferraro and any other case where a plaintiff receives insurance payments? Only the (fortuity) that in Ferraro the subrogated insurer beat the plaintiff to the court house in a separate action. Should that really make a difference? While we leave that issue to another day, we can observe that if the Ferraro court was indeed wrong in overriding the collateral source rule in that case, that incorrect decision functioned as the original sin contaminating the appellate court's analysis of the section 1032 issue.
[14] As regards the methodology of section 877, Syverson is clear that section 877 operates against an award or verdict prior to the entry of judgment, as distinct from a system where a defendant merely receives a satisfaction of judgment based on prior settlements. The court said: "Code of Civil Procedure section 877 `requires that a judgment be reduced by amounts paid by settling joint tortfeasors.'" (Syverson, supra, 171 Cal.App.3d at p. 110, 214 Cal.Rptr. 581, italics omitted.)

In that respect the Syverson decision is thoroughly sound. As we show further on, the use of the word "claims" in section 877 requires that the statute operate prior to judgment.
[15] Either that, or section 877 assumes the existence of defendants who are willing to throw money at a plaintiff regardless of the viability of his or her claims.
[16] The language has been repeated many times, precisely because courts must remind themselves that rewriting statutes is not permitted under the American system of law.